## SPINELLI *v.* UNITED STATES.

No. 8. Argued October 16–17, 1968.—Decided January 27, 1969.

*Irl B. Baris* argued the cause and filed a brief for petitioner.

*Joseph J. Connolly* argued the cause for the United States, *pro hac vice.* With him on the brief were *Solicitor General Griswold, Assistant Attorney General Vinson, Beatrice Rosenberg,* and *Sidney M. Glazer.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

William Spinelli was convicted under 18 U. S. C. § 1952 [1] of traveling to St. Louis, Missouri, from a nearby Illinois suburb with the intention of conducting gambling activities proscribed by Missouri law. See Mo. Rev. Stat. § 563.360 (1959). At every appropriate stage in the proceedings in the lower courts, the petitioner challenged the constitutionality of the warrant which authorized the FBI search that uncovered the evidence necessary for his conviction. At each stage, Spinelli's challenge was treated in a different way. At a pretrial suppression hearing, the United States District Court for the Eastern District of Missouri held that Spinelli

---

[1] The relevant portion of the statute reads:

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate . . . commerce . . . with intent to—

.    .    .    .    .

"(3) otherwise promote, manage, establish, carry on . . . any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling . . . in violation of the laws of the State in which they are committed or of the United States . . . ."

lacked standing to raise a Fourth Amendment objection. A unanimous panel of the Court of Appeals for the Eighth Circuit rejected the District Court's ground, a majority holding further that the warrant was issued without probable cause. After an *en banc* rehearing, the Court of Appeals sustained the warrant and affirmed the conviction by a vote of six to two. 382 F. 2d 871. Both the majority and dissenting *en banc* opinions reflect a most conscientious effort to apply the principles we announced in *Aguilar* v. *Texas,* 378 U. S. 108 (1964), to a factual situation whose basic characteristics have not been at all uncommon in recent search warrant cases. Believing it desirable that the principles of *Aguilar* should be further explicated, we granted certiorari, 390 U. S. 942, our writ being later limited to the question of the constitutional validity of the search and seizure.[2] 391 U. S. 933. For reasons that follow we reverse.

In *Aguilar,* a search warrant had issued upon an affidavit of police officers who swore only that they had "received reliable information from a credible person and do believe" that narcotics were being illegally stored on the described premises. While recognizing that the constitutional requirement of probable cause can be satisfied by hearsay information, this Court held the

---

[2] We agree with the Court of Appeals that Spinelli has standing to raise his Fourth Amendment claim. The issue arises because at the time the FBI searched the apartment in which Spinelli was alleged to be conducting his bookmaking operation, the petitioner was not on the premises. Instead, the agents did not execute their search warrant until Spinelli was seen to leave the apartment, lock the door, and enter the hallway. At that point, petitioner was arrested, the key to the apartment was demanded of him, and the search commenced. Since petitioner would plainly have standing if he had been arrested inside the apartment, *Jones* v. *United States,* 362 U. S. 257, 267 (1960), it cannot matter that the agents preferred to delay the arrest until petitioner stepped into the hallway—especially when the FBI only managed to gain entry into the apartment by requiring petitioner to surrender his key.

affidavit inadequate for two reasons. First, the application failed to set forth any of the "underlying circumstances" necessary to enable the magistrate independently to judge of the validity of the informant's conclusion that the narcotics were where he said they were. Second, the affiant-officers did not attempt to support their claim that their informant was " 'credible' or his information 'reliable.' " The Government is, however, quite right in saying that the FBI affidavit in the present case is more ample than that in *Aguilar*. Not only does it contain a report from an anonymous informant, but it also contains a report of an independent FBI investigation which is said to corroborate the informant's tip. We are, then, required to delineate the manner in which *Aguilar*'s two-pronged test should be applied in these circumstances.

In essence, the affidavit, reproduced in full in the Appendix to this opinion, contained the following allegations: [3]

1. The FBI had kept track of Spinelli's movements on five days during the month of August 1965. On four of these occasions, Spinelli was seen crossing one of two bridges leading from Illinois into St. Louis, Missouri, between 11 a. m. and 12:15 p. m. On four of the five days, Spinelli was also seen parking his car in a lot used by residents of an apartment house at 1108 Indian Circle Drive in St. Louis, between 3:30 p. m. and 4:45 p. m.[4]

---

[3] It is, of course, of no consequence that the agents might have had additional information which could have been given to the Commissioner. "It is elementary that in passing on the validity of a warrant, the reviewing court may consider *only* information brought to the magistrate's attention." *Aguilar* v. *Texas*, 378 U. S. 108, 109, n. 1 (emphasis in original). Since the Government does not argue that whatever additional information the agents may have possessed was sufficient to provide probable cause for the arrest, thereby justifying the resultant search as well, we need not consider that question.

[4] No report was made as to Spinelli's movements during the period between his arrival in St. Louis at noon and his arrival at the parking

On one day, Spinelli was followed further and seen to enter a particular apartment in the building.

2. An FBI check with the telephone company revealed that this apartment contained two telephones listed under the name of Grace P. Hagen, and carrying the numbers WYdown 4–0029 and WYdown 4–0136.

3. The application stated that "William Spinelli is known to this affiant and to federal law enforcement agents and local law enforcement agents as a bookmaker, an associate of bookmakers, a gambler, and an associate of gamblers."

4. Finally, it was stated that the FBI "has been informed by a confidential reliable informant that William Spinelli is operating a handbook and accepting wagers and disseminating wagering information by means of the telephones which have been assigned the numbers WYdown 4–0029 and WYdown 4–0136."

There can be no question that the last item mentioned, detailing the informant's tip, has a fundamental place in this warrant application. Without it, probable cause could not be established. The first two items reflect only innocent-seeming activity and data. Spinelli's travels to and from the apartment building and his entry into a particular apartment on one occasion could hardly be taken as bespeaking gambling activity; and there is surely nothing unusual about an apartment containing two separate telephones. Many a householder indulges himself in this petty luxury. Finally, the allegation that Spinelli was "known" to the affiant and to other federal and local law enforcement officers as a gambler and an associate of gamblers is but a bald and unilluminating assertion of suspicion that is entitled to no weight in appraising the magistrate's decision. *Nathanson* v. *United States,* 290 U. S. 41, 46 (1933).

lot in the late afternoon. In fact, the evidence at trial indicated that Spinelli frequented the offices of his stockbroker during this period.

So much indeed the Government does not deny. Rather, following the reasoning of the Court of Appeals, the Government claims that the informant's tip gives a suspicious color to the FBI's reports detailing Spinelli's innocent-seeming conduct and that, conversely, the FBI's surveillance corroborates the informant's tip, thereby entitling it to more weight. It is true, of course, that the magistrate is obligated to render a judgment based upon a common-sense reading of the entire affidavit. *United States* v. *Ventresca,* 380 U. S. 102, 108 (1965). We believe, however, that the "totality of circumstances" approach taken by the Court of Appeals paints with too broad a brush. Where, as here, the informer's tip is a necessary element in a finding of probable cause, its proper weight must be determined by a more precise analysis.

The informer's report must first be measured against *Aguilar*'s standards so that its probative value can be assessed. If the tip is found inadequate under *Aguilar,* the other allegations which corroborate the information contained in the hearsay report should then be considered. At this stage as well, however, the standards enunciated in *Aguilar* must inform the magistrate's decision. He must ask: Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar*'s tests without independent corroboration? *Aguilar* is relevant at this stage of the inquiry as well because the tests it establishes were designed to implement the long-standing principle that probable cause must be determined by a "neutral and detached magistrate," and not by "the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States,* 333 U. S. 10, 14 (1948). A magistrate cannot be said to have properly discharged his constitutional duty if he relies on an informer's tip which—even

when partially corroborated—is not as reliable as one which passes *Aguilar*'s requirements when standing alone.

Applying these principles to the present case, we first consider the weight to be given the informer's tip when it is considered apart from the rest of the affidavit. It is clear that a Commissioner could not credit it without abdicating his constitutional function. Though the affiant swore that his confidant was "reliable," he offered the magistrate no reason in support of this conclusion. Perhaps even more important is the fact that *Aguilar*'s other test has not been satisfied. The tip does not contain a sufficient statement of the underlying circumstances from which the informer concluded that Spinelli was running a bookmaking operation. We are not told how the FBI's source received his information—it is not alleged that the informant personally observed Spinelli at work or that he had ever placed a bet with him. Moreover, if the informant came by the information indirectly, he did not explain why his sources were reliable. Cf. *Jaben* v. *United States,* 381 U. S. 214 (1965). In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation.

The detail provided by the informant in *Draper* v. *United States,* 358 U. S. 307 (1959), provides a suitable benchmark. While Hereford, the Government's informer in that case, did not state the way in which he had obtained his information, he reported that Draper had gone to Chicago the day before by train and that he would return to Denver by train with three ounces of heroin on one of two specified mornings. Moreover,

Hereford went on to describe, with minute particularity, the clothes that Draper would be wearing upon his arrival at the Denver station. A magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way.[5] Such an inference cannot be made in the present case. Here, the only facts supplied were that Spinelli was using two specified telephones and that these phones were being used in gambling operations. This meager report could easily have been obtained from an offhand remark heard at a neighborhood bar.

Nor do we believe that the patent doubts *Aguilar* raises as to the report's reliability are adequately resolved by a consideration of the allegations detailing the FBI's independent investigative efforts. At most, these allegations indicated that Spinelli could have used the telephones specified by the informant for some purpose. This cannot by itself be said to support both the inference that the informer was generally trustworthy and that he had made his charge against Spinelli on the basis of information obtained in a reliable way. Once again, *Draper* provides a relevant comparison. Independent police work in that case corroborated much more than one small detail that had been provided by the informant. There, the police, upon meeting the inbound Denver train on the second morning specified by informer Hereford, saw a man whose dress corresponded precisely to Hereford's detailed description. It was then apparent that the informant had not been fabricating his report out of whole cloth; since the report was of the sort which in common experience may be recognized as having been

---

[5] While *Draper* involved the question whether the police had probable cause for an arrest without a warrant, the analysis required for an answer to this question is basically similar to that demanded of a magistrate when he considers whether a search warrant should issue.

obtained in a reliable way, it was perfectly clear that probable cause had been established.

We conclude, then, that in the present case the informant's tip—even when corroborated to the extent indicated—was not sufficient to provide the basis for a finding of probable cause. This is not to say that the tip was so insubstantial that it could not properly have counted in the magistrate's determination. Rather, it needed some further support. When we look to the other parts of the application, however, we find nothing alleged which would permit the suspicions engendered by the informant's report to ripen into a judgment that a crime was probably being committed. As we have already seen, the allegations detailing the FBI's surveillance of Spinelli and its investigation of the telephone company records contain no suggestion of criminal conduct when taken by themselves—and they are not endowed with an aura of suspicion by virtue of the informer's tip. Nor do we find that the FBI's reports take on a sinister color when read in light of common knowledge that bookmaking is often carried on over the telephone and from premises ostensibly used by others for perfectly normal purposes. Such an argument would carry weight in a situation in which the premises contain an unusual number of telephones or abnormal activity is observed, cf. *McCray* v. *Illinois,* 386 U. S. 300, 302 (1967), but it does not fit this case where neither of these factors is present.[6] All that remains to be considered is the flat statement that Spinelli was "known" to the FBI and others as a gambler. But just as a simple assertion of police suspicion is not itself a sufficient basis for a magistrate's finding of probable cause, we do not believe it may be used to give

---

[6] A box containing three uninstalled telephones was found in the apartment, but only after execution of the search warrant.

additional weight to allegations that would otherwise be insufficient.

The affidavit, then, falls short of the standards set forth in *Aguilar, Draper,* and our other decisions that give content to the notion of probable cause.[7]  In holding as we have done, we do not retreat from the established propositions that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, *Beck* v. *Ohio,* 379 U. S. 89, 96 (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, *McCray* v. *Illinois,* 386 U. S. 300, 311 (1967); that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, *United States* v. *Ventresca,* 380 U. S. 102, 108 (1965); and that their determination of probable cause should be paid great deference by reviewing courts, *Jones* v. *United States,* 362 U. S. 257, 270–271 (1960).  But we cannot sustain this warrant without diluting important safeguards that assure that the judgment of a disinterested judicial officer will interpose itself between the police and the citizenry.[8]

---

[7] In those cases in which this Court has found probable cause established, the showing made was much more substantial than the one made here.  Thus, in *United States* v. *Ventresca,* 380 U. S. 102, 104 (1965), FBI agents observed repeated deliveries of loads of sugar in 60-pound bags, smelled the odor of fermenting mash, and heard " 'sounds similar to that of a motor or a pump coming from the direction of' Ventresca's house."  Again, in *McCray* v. *Illinois,* 386 U. S. 300, 303–304 (1967), the informant reported that McCray " 'was selling narcotics and had narcotics on his person now in the vicinity of 47th and Calumet.' "  When the police arrived at the intersection, they observed McCray engaging in various suspicious activities.  386 U. S., at 302.

[8] In the view we have taken of this case, it becomes unnecessary to decide whether the search warrant was properly executed, or whether it sufficiently described the things that were seized.

The judgment of the Court of Appeals is reversed and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

## APPENDIX TO OPINION OF THE COURT.

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT.

I, Robert L. Bender, being duly sworn, depose and say that I am a Special Agent of the Federal Bureau of Investigation, and as such am authorized to make searches and seizures.

That on August 6, 1965, at approximately 11:44 a. m., William Spinelli was observed by an Agent of the Federal Bureau of Investigation driving a 1964 Ford convertible, Missouri license HC3–649, onto the Eastern approach of the Veterans Bridge leading from East St. Louis, Illinois, to St. Louis, Missouri.

That on August 11, 1965, at approximately 11:16 a. m., William Spinelli was observed by an Agent of the Federal Bureau of Investigation driving a 1964 Ford convertible, Missouri license HC3–649, onto the Eastern approach of the Eads Bridge leading from East St. Louis, Illinois, to St. Louis, Missouri.

Further, at approximately 11:18 a. m. on August 11, 1965, I observed William Spinelli driving the aforesaid Ford convertible from the Western approach of the Eads Bridge into St. Louis, Missouri.

Further, at approximately 4:40 p. m. on August 11, 1965, I observed the aforesaid Ford convertible, bearing Missouri license HC3–649, parked in a parking lot used by residents of The Chieftain Manor Apartments, approximately one block east of 1108 Indian Circle Drive.

On August 12, 1965, at approximately 12:07 p. m.,

William Spinelli was observed by an Agent of the Federal Bureau of Investigation driving the aforesaid 1964 Ford convertible onto the Eastern approach of the Veterans Bridge from East St. Louis, Illinois, in the direction of St. Louis, Missouri.

Further, on August 12, 1965, at approximately 3:46 p. m., I observed William Spinelli driving the aforesaid 1964 Ford convertible onto the parking lot used by the residents of The Chieftain Manor Apartments approximately one block east of 1108 Indian Circle Drive.

Further, on August 12, 1965, at approximately 3:49 p. m., William Spinelli was observed by an Agent of the Federal Bureau of Investigation entering the front entrance of the two-story apartment building located at 1108 Indian Circle Drive, this building being one of The Chieftain Manor Apartments.

On August 13, 1965, at approximately 11:08 a. m., William Spinelli was observed by an Agent of the Federal Bureau of Investigation driving the aforesaid Ford convertible onto the Eastern approach of the Eads Bridge from East St. Louis, Illinois, heading towards St. Louis, Missouri.

Further, on August 13, 1965, at approximately 11:11 a. m., I observed William Spinelli driving the aforesaid Ford convertible from the Western approach of the Eads Bridge into St. Louis, Missouri.

Further, on August 13, 1965, at approximately 3:45 p. m., I observed William Spinelli driving the aforesaid 1964 Ford convertible onto the parking area used by residents of The Chieftain Manor Apartments, said parking area being approximately one block from 1108 Indian Circle Drive.

Further, on August 13, 1965, at approximately 3:55 p. m., William Spinelli was observed by an Agent of the Federal Bureau of Investigation entering the corner apartment located on the second floor in the southwest corner, known as Apartment F, of the two-story

apartment building known and numbered as 1108 Indian Circle Drive.

On August 16, 1965, at approximately 3:22 p. m., I observed William Spinelli driving the aforesaid Ford convertible onto the parking lot used by the residents of The Chieftain Manor Apartments approximately one block east of 1108 Indian Circle Drive.

Further, an Agent of the F. B. I. observed William Spinelli alight from the aforesaid Ford convertible and walk toward the apartment building located at 1108 Indian Circle Drive.

The records of the Southwestern Bell Telephone Company reflect that there are two telephones located in the southwest corner apartment on the second floor of the apartment building located at 1108 Indian Circle Drive under the name of Grace P. Hagen. The numbers listed in the Southwestern Bell Telephone Company records for the aforesaid telephones are WYdown 4-0029 and WYdown 4-0136.

William Spinelli is known to this affiant and to federal law enforcement agents and local law enforcement agents as a bookmaker, an associate of bookmakers, a gambler, and an associate of gamblers.

The Federal Bureau of Investigation has been informed by a confidential reliable informant that William Spinelli is operating a handbook and accepting wagers and disseminating wagering information by means of the telephones which have been assigned the numbers WYdown 4-0029 and WYdown 4-0136.

/s/ Robert L. Bender,
Robert L. Bender,
Special Agent, Federal Bureau
of Investigation.

Subscribed and sworn to before me this 18th day of August, 1965, at St. Louis, Missouri.

/s/ William R. O'Toole.

Mr. Justice White, concurring.

An investigator's affidavit that he has seen gambling equipment being moved into a house at a specified address will support the issuance of a search warrant. The oath affirms the honesty of the statement and negatives the lie or imagination. Personal observation attests to the facts asserted—that there is gambling equipment on the premises at the named address.

But if the officer simply avers, without more, that there is gambling paraphernalia on certain premises, the warrant should not issue, even though the belief of the officer is an honest one, as evidenced by his oath, and even though the magistrate knows him to be an experienced, intelligent officer who has been reliable in the past. This much was settled in *Nathanson* v. *United States,* 290 U. S. 41 (1933), where the Court held insufficient an officer's affidavit swearing he had cause to believe that there was illegal liquor on the premises for which the warrant was sought. The unsupported assertion or belief of the officer does not satisfy the requirement of probable cause. *Jones* v. *United States,* 362 U. S. 257, 269 (1960); *Grau* v. *United States,* 287 U. S. 124 (1932); *Byars* v. *United States,* 273 U. S. 28, 29 (1927).

What is missing in *Nathanson* and like cases is a statement of the basis for the affiant's believing the facts contained in the affidavit—the good "cause" which the officer in *Nathanson* said he had. If an officer swears that there is gambling equipment at a certain address, the possibilities are (1) that he has seen the equipment; (2) that he has observed or perceived facts from which the presence of the equipment may reasonably be inferred; and (3) that he has obtained the information from someone else. If (1) is true, the affidavit is good. But in (2), the affidavit is insufficient unless the perceived facts are given, for it is the magistrate, not the

officer, who is to judge the existence of probable cause. *Aguilar* v. *Texas*, 378 U. S. 108 (1964); *Giordenello* v. *United States*, 357 U. S. 480, 486 (1958); *Johnson* v. *United States*, 333 U. S. 10, 14 (1948). With respect to (3), where the officer's information is hearsay, no warrant should issue absent good cause for crediting that hearsay. Because an affidavit asserting, without more, the location of gambling equipment at a particular address does not claim personal observation of any of the facts by the officer, and because of the likelihood that the information came from an unidentified third party, affidavits of this type are unacceptable.

Neither should the warrant issue if the officer states that there is gambling equipment in a particular apartment and that his information comes from an informant, named or unnamed, since the honesty of the informant and the basis for his report are unknown. Nor would the missing elements be completely supplied by the officer's oath that the informant has often furnished reliable information in the past. This attests to the honesty of the informant, but *Aguilar* v. *Texas*, *supra*, requires something more—did the information come from observation, or did the informant in turn receive it from another? Absent additional facts for believing the informant's report, his assertion stands no better than the oath of the officer to the same effect. Indeed, if the affidavit of an officer, known by the magistrate to be honest and experienced, stating that gambling equipment is located in a certain building is unacceptable, it would be quixotic if a similar statement from an honest informant were found to furnish probable cause. A strong argument can be made that both should be acceptable under the Fourth Amendment, but under our cases neither is. The past reliability of the informant can no more furnish probable cause for believing his

current report than can previous experience with the officer himself.

If the affidavit rests on hearsay—an informant's report—what is necessary under *Aguilar* is one of two things: the informant must declare either (1) that he has himself seen or perceived the fact or facts asserted; or (2) that his information is hearsay, but there is good reason for believing it—perhaps one of the usual grounds for crediting hearsay information. The first presents few problems: since the report, although hearsay, purports to be first-hand observation, remaining doubt centers on the honesty of the informant, and that worry is dissipated by the officer's previous experience with the informant. The other basis for accepting the informant's report is more complicated. But if, for example, the informer's hearsay comes from one of the actors in the crime in the nature of admission against interest, the affidavit giving this information should be held sufficient.

I am inclined to agree with the majority that there are limited special circumstances in which an "honest" informant's report, if sufficiently detailed, will in effect verify itself—that is, the magistrate when confronted with such detail could reasonably infer that the informant had gained his information in a reliable way. See *ante,* at 417. Detailed information may sometimes imply that the informant himself has observed the facts. Suppose an informant with whom an officer has had satisfactory experience states that there is gambling equipment in the living room of a specified apartment and describes in detail not only the equipment itself but also the appointments and furnishings in the apartment. Detail like this, if true at all, must rest on personal observation either of the informant or of someone else. If the latter, we know nothing of the third person's honesty or

sources; he may be making a wholly false report. But it is arguable that on these facts it was the inform- ant himself who has perceived the facts, for the informa- tion reported is not usually the subject of casual, day-to- day conversation. Because the informant is honest and it is probable that he has viewed the facts, there is probable cause for the issuance of a warrant.

So too in the special circumstances of *Draper* v. *United States,* 358 U. S. 307 (1959), the kind of information related by the informant is not generally sent ahead of a person's arrival in a city except to those who are inti- mately connected with making careful arrangements for meeting him. The informant, posited as honest, some- how had the reported facts, very likely from one of the actors in the plan, or as one of them himself. The majority's suggestion is that a warrant could have been obtained based only on the informer's report. I am inclined to agree, although it seems quite plain that if it may be so easily inferred from the affidavit that the informant has himself observed the facts or has them from an actor in the event, no possible harm could come from requiring a statement to that effect, thereby remov- ing the difficult and recurring questions which arise in such situations.

Of course, *Draper* itself did not proceed on this basis. Instead, the Court pointed out that when the officer saw a person getting off the train at the specified time, dressed and conducting himself precisely as the informant had predicted, all but the critical fact with respect to pos- sessing narcotics had then been verified and for that reason the officer had "reasonable grounds" to believe also that Draper was carrying narcotics. Unquestion- ably, verification of arrival time, dress, and gait re- inforced the honesty of the informant—he had not reported a made-up story. But if what *Draper* stands for is that the existence of the tenth and critical fact

is made sufficiently probable to justify the issuance of a warrant by verifying nine other facts coming from the same source, I have my doubts about that case.

In the first place, the proposition is not that the tenth fact may be logically inferred from the other nine or that the tenth fact is usually found in conjunction with the other nine. No one would suggest that just anyone getting off the 10:30 train dressed as Draper was, with a brisk walk and carrying a zipper bag, should be arrested for carrying narcotics. The thrust of *Draper* is not that the verified facts have independent significance with respect to proof of the tenth. The argument instead relates to the reliability of the source: because an informant is right about some things, he is more probably right about other facts, usually the critical, unverified facts.

But the Court's cases have already rejected for Fourth Amendment purposes the notion that the past reliability of an officer is sufficient reason for believing his current assertions. Nor would it suffice, I suppose, if a reliable informant states there is gambling equipment in Apartment 607 and then proceeds to describe in detail Apartment 201, a description which is verified before applying for the warrant. He was right about 201, but that hardly makes him more believable about the equipment in 607. But what if he states that there are narcotics locked in a safe in Apartment 300, which is described in detail, and the apartment manager verifies everything but the contents of the safe? I doubt that the report about the narcotics is made appreciably more believable by the verification. The informant could still have gotten his information concerning the safe from others about whom nothing is known or could have inferred the presence of narcotics from circumstances which a magistrate would find unacceptable.

The tension between *Draper* and the *Nathanson-Aguilar* line of cases is evident from the course followed

by the majority opinion. First, it is held that the report from a reliable informant that Spinelli is using two telephones with specified numbers to conduct a gambling business plus Spinelli's reputation in police circles as a gambler does not add up to probable cause. This is wholly consistent with *Aguilar* and *Nathanson:* the informant did not reveal whether he had personally observed the facts or heard them from another and, if the latter, no basis for crediting the hearsay was presented. Nor were the facts, as MR. JUSTICE HARLAN says, of such a nature that they normally would be obtainable only by the personal observation of the informant himself. The police, however, did not stop with the informant's report. Independently, they established the existence of two phones having the given numbers and located them in an apartment house which Spinelli was regularly frequenting away from his home. There remained little question but that Spinelli was using the phones, and it was a fair inference that the use was not for domestic but for business purposes. The informant had claimed the business involved gambling. Since his specific information about Spinelli using two phones with particular numbers had been verified, did not his allegation about gambling thereby become sufficiently more believable if the *Draper* principle is to be given any scope at all? I would think so, particularly since the information from the informant which was verified was not neutral, irrelevant information but was material to proving the gambling allegation: two phones with different numbers in an apartment used away from home indicates a business use in an operation, like bookmaking, where multiple phones are needed. The *Draper* approach would reasonably justify the issuance of a warrant in this case, particularly since the police had some awareness of Spinelli's past activities. The majority, how-

ever, while seemingly embracing *Draper,* confines that case to its own facts. Pending full-scale reconsideration of that case, on the one hand, or of the *Nathanson-Aguilar* cases on the other, I join the opinion of the Court and the judgment of reversal, especially since a vote to affirm would produce an equally divided Court.

MR. JUSTICE BLACK, dissenting.

In my view, this Court's decision in *Aguilar* v. *Texas,* 378 U. S. 108 (1964), was bad enough. That decision went very far toward elevating the magistrate's hearing for issuance of a search warrant to a full-fledged trial, where witnesses must be brought forward to attest personally to all the facts alleged. But not content with this, the Court today expands *Aguilar* to almost unbelievable proportions. Of course, it would strengthen the probable-cause presentation if eyewitnesses could testify that they saw the defendant commit the crime. It would be stronger still if these witnesses could explain in detail the nature of the sensual perceptions on which they based their "conclusion" that the person they had seen was the defendant and that he was responsible for the events they observed. Nothing in our Constitution, however, requires that the facts be established with that degree of certainty and with such elaborate specificity before a policeman can be authorized by a disinterested magistrate to conduct a carefully limited search.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." In this case a search warrant was issued supported by an oath and particularly describing the place to be searched and the things to be seized. The supporting oath was

three printed pages and the full text of it is included in an Appendix to the Court's opinion. The magistrate, I think properly, held the information set forth sufficient facts to show "probable cause" that the defendant was violating the law. Six members of the Court of Appeals also agreed that the affidavit was sufficient to show probable cause. A majority of this Court today holds, however, that the magistrate and all of these judges were wrong. In doing so, they substitute their own opinion for that of the local magistrate and the circuit judges, and reject the *en banc* factual conclusion of the Eighth Circuit and reverse the judgment based upon that factual conclusion. I cannot join in any such disposition of an issue so vital to the administration of justice, and dissent as vigorously as I can.

I repeat my belief that the affidavit given the magistrate was more than ample to show probable cause of the petitioner's guilt. The affidavit meticulously set out facts sufficient to show the following:

1. The petitioner had been shown going to and coming from a room in an apartment which contained two telephones listed under the name of another person. Nothing in the record indicates that the apartment was of that large and luxurious type which could only be occupied by a person to whom it would be a "petty luxury" to have two separate telephones, with different numbers, both listed under the name of a person who did not live there.

2. The petitioner's car had been observed parked in the apartment's parking lot. This fact was, of course, highly relevant in showing that the petitioner was extremely interested in some enterprise which was located in the apartment.

3. The FBI had been informed by a reliable informant that the petitioner was accepting wagering information by telephones—the particular telephones located in the

apartment the defendant had been repeatedly visiting. Unless the Court, going beyond the requirements of the Fourth Amendment, wishes to require magistrates to hold trials before issuing warrants, it is not necessary— as the Court holds—to have the affiant explain "the underlying circumstances from which the informer concluded that Spinelli was running a bookmaking operation." *Ante,* at 416.

4. The petitioner was known by federal and local law enforcement agents as a bookmaker and an associate of gamblers. I cannot agree with the Court that this knowledge was only a "bald and unilluminating assertion of suspicion that is entitled to no weight in appraising the magistrate's decision." *Ante,* at 414. Although the statement is hearsay that might not be admissible in a regular trial, everyone knows, unless he shuts his eyes to the realities of life, that this is a relevant fact which, together with other circumstances, might indicate a factual probability that gambling is taking place.

The foregoing facts should be enough to constitute probable cause for anyone who does not believe that the only way to obtain a search warrant is to prove beyond a reasonable doubt that a defendant is guilty. Even *Aguilar,* on which the Court relies, cannot support the contrary result, at least as that decision was written before today's massive escalation of it. In *Aguilar* the Court dealt with an affidavit that stated only:

> "Affiants have received reliable information from a credible person and do believe that heroin . . . and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law." 378 U. S., at 109.

The Court held, over the dissent of Mr. Justice Clark, MR. JUSTICE STEWART, and myself, that this unsupported conclusion of an unidentified informant provided no basis

for the magistrate to make an independent judgment as to the persuasiveness of the facts relied upon to show probable cause. Here, of course, we have much more, and the Court in *Aguilar* was careful to point out that additional information of the kind presented in the affidavit before us now would be highly relevant:

> "If the fact and results of such a surveillance had been appropriately presented to the magistrate, this would, of course, present an entirely different case." 378 U. S., at 109, n. 1.

In the present case even the two-judge minority of the court below recognized, as this Court seems to recognize today, that this additional information took the case beyond the rule of *Aguilar*. Six of the other circuit judges disagreed with the two dissenting judges, finding that all the circumstances considered together could support a reasonable judgment that gambling probably was taking place. I fully agree with this carefully considered opinion of the court below.

I regret to say I consider today's decision an indefensible departure from the principles of our former cases. Less than four years ago we reaffirmed these principles in *United States* v. *Ventresca*, 380 U. S. 102, 108 (1965):

> "If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. . . . Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area."

See also *Husty* v. *United States*, 282 U. S. 694, 700–701 (1931).

Departures of this kind are responsible for considerable uneasiness in our lower courts, and I must say I

am deeply troubled by the statements of Judge Gibson in the court below:

"I am, indeed, disturbed by decision after decision of our courts which place increasingly technical burdens upon law enforcement officials. I am disturbed by these decisions that appear to relentlessly chip away at the ever narrowing area of effective police operation. I believe the holdings in *Aguilar,* and *Rugendorf* v. *United States,* 376 U. S. 528 (1964) are sufficient to protect the privacy of individuals from hastily conceived intrusions, and I do not think the limitations and requirements on the issuance of search warrants should be expanded by setting up over-technical requirements approaching the now discarded pitfalls of common law pleadings. Moreover, if we become increasingly technical and rigid in our demands upon police officers, I fear we make it increasingly easy for criminals to operate, detected but unpunished. I feel the significant movement of the law beyond its present state is unwarranted, unneeded, and dangerous to law enforcement efficiency." (Dissenting from panel opinion.)

The Court of Appeals in this case took a sensible view of the Fourth Amendment, and I would wholeheartedly affirm its decision.

*Mapp* v. *Ohio,* 367 U. S. 643, decided in 1961, held for the first time that the Fourth Amendment and the exclusionary rule of *Weeks* v. *United States,* 232 U. S. 383 (1914) are now applicable to the States. That Amendment provides that search warrants shall not be issued without probable cause. The existence of probable cause is a factual matter that calls for the determination of a factual question. While no statistics are immediately available, questions of probable cause to issue search

warrants and to make arrests are doubtless involved in many thousands of cases in state courts. All of those probable-cause state cases are now potentially reviewable by this Court. It is, of course, physically impossible for this Court to review the evidence in all or even a substantial percentage of those cases. Consequently, whether desirable or not, we must inevitably accept most of the fact findings of the state courts, particularly when, as here in a federal case, both the trial and appellate courts have decided the facts the same way. It cannot be said that the trial judge and six members of the Court of Appeals committed flagrant error in finding from evidence that the magistrate had probable cause to issue the search warrant here. It seems to me that this Court would best serve itself and the administration of justice by accepting the judgment of the two courts below. After all, they too are lawyers and judges, and much closer to the practical, everyday affairs of life than we are.

Notwithstanding the Court's belief to the contrary, I think that in holding as it does, the Court does:

> "retreat from the established propositions that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, *Beck* v. *Ohio,* 379 U. S. 89, 96 (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, *McCray* v. *Illinois,* 386 U. S. 300, 311 (1967); that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, *United States* v. *Ventresca,* 380 U. S. 102, 108 (1965); and that their determination of probable cause should be paid great deference by reviewing courts, *Jones* v. *United States,* 362 U. S. 257, 270–271 (1960)." *Ante,* at 419.

In fact, I believe the Court is moving rapidly, through complex analyses and obfuscatory language, toward the holding that no magistrate can issue a warrant unless according to some unknown standard of proof he can be persuaded that the suspect defendant is actually guilty of a crime. I would affirm this conviction.

MR. JUSTICE FORTAS, dissenting.

My Brother HARLAN's opinion for the Court is animated by a conviction which I share that "[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment— is basic to a free society." *Wolf* v. *Colorado,* 338 U. S. 25, 27 (1949).

We may well insist upon a sympathetic and even an indulgent view of the latitude which must be accorded to the police for performance of their vital task; but only a foolish or careless people will deduce from this that the public welfare requires or permits the police to disregard the restraints on their actions which historic struggles for freedom have developed for the protection of liberty and dignity of citizens against arbitrary state power.

As Justice Jackson (dissenting) stated in *Brinegar* v. *United States,* 338 U. S. 160, 180–181 (1949):

"[The provisions of the Fourth Amendment] are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the

human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police."

History [1] teaches us that this protection requires that the judgment of a judicial officer be interposed between the police, hot in pursuit of their appointed target, and the citizen; [2] that the judicial officer must judge and not merely rubber-stamp; and that his judgment must be based upon judicially reliable facts adequate to demonstrate that the search is justified by the probability that it will yield the fruits or instruments of crime—or, as this Court has only recently ruled, tangible evidence of its commission. [3] The exceptions to the requirement of a search warrant have always been narrowly restricted [4] because of this Court's long-standing awareness of the fundamental role of the magistrate's judgment in the preservation of a proper balance between individual freedom and state power. See *Trupiano* v. *United States,* 334 U. S. 699, 700 (1948).

Today's decision deals, not with the necessity of obtaining a warrant prior to search, but with the difficult problem of the nature of the showing that must be made

---

[1] "The knock at the door, whether by day or by night, as a prelude to a search, without authority of law but solely on the authority of the police, did not need the commentary of recent history to be condemned as inconsistent with the conception of human rights enshrined in the history and the basic constitutional documents of English-speaking peoples." *Wolf* v. *Colorado,* 338 U. S. 25, 28 (1949). See *United States* v. *Rabinowitz,* 339 U. S. 56, 69–70 (1950) (Frankfurter, J., dissenting). See generally with respect to the history of the Fourth Amendment N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution (1937).

[2] See *Johnson* v. *United States,* 333 U. S. 10, 13–14 (1948).

[3] *Warden* v. *Hayden,* 387 U. S. 294 (1967).

[4] See *Jones* v. *United States,* 357 U. S. 493, 499 (1958); *Warden* v. *Hayden,* 387 U. S. 294, 311 (1967) (concurring opinion).

before the magistrate to justify his issuance of a search warrant.  While I do not subscribe to the criticism of the majority expressed by my Brother BLACK in dissent, I believe—with all respect—that the majority is in error in holding that the affidavit supporting the warrant in this case is constitutionally inadequate.

The affidavit is unusually long and detailed.  In fact, it recites so many minute and detailed facts developed in the course of the investigation of Spinelli that its substance is somewhat obscured.  It is paradoxical that this very fullness of the affidavit may be the source of the constitutional infirmity that the majority finds.  Stated in language more direct and less circumstantial than that used by the FBI agent who executed the affidavit, it sets forth that the FBI has been informed that Spinelli is accepting wagers by means of telephones numbered WY 4–0029 and WY 4–0136; that Spinelli is known to the affiant agent and to law enforcement agencies as a bookmaker; that telephones numbered WY 4–0029 and WY 4–0136 are located in a certain apartment; that Spinelli was placed under surveillance and his observed movements were such as to show his use of that apartment and to indicate that he frequented the apartment on a regular basis.

*Aguilar* v. *Texas,* 378 U. S. 108 (1964), holds that the reference in an affidavit to information described only as received from "a confidential reliable informant," standing alone, is not an adequate basis for issuance of a search warrant.  The majority agrees that the "FBI affidavit in the present case is more ample than that in *Aguilar*," but concludes that it is nevertheless constitutionally inadequate.  The majority states that the present affidavit fails to meet the "two-pronged test" of *Aguilar* because (a) it does not set forth the basis for the assertion that the informer is "reliable" and (b) it fails to state the "underlying circumstances" upon which the

informant based his conclusion that Spinelli was engaged in bookmaking.

The majority acknowledges, however, that its reference to a "two-pronged test" should not be understood as meaning that an affidavit deficient in these respects is necessarily inadequate to support a search warrant. Other facts and circumstances may be attested which will supply the evidence of probable cause needed to support the search warrant. On this general statement we are agreed. Our difference is that I believe such facts and circumstances are present in this case, and the majority arrives at the opposite conclusion.

*Aguilar* expressly recognized that if, in that case, the affidavit's conclusory report of the informant's story had been supplemented by "the fact and results of . . . a surveillance . . . this would, of course, present an entirely different case." 378 U. S., at 109, n. 1. In the present case, as I view it, the affidavit showed not only relevant surveillance, entitled to some probative weight for purposes of the issuance of a search warrant, but also additional, specific facts of significance and adequate reliability: that Spinelli was using two telephone numbers, identified by an "informant" as being used for bookmaking, in his illegal operations; that these telephones were in an identified apartment; and that Spinelli, a known bookmaker,[5] frequented the apartment. Certainly, this is enough.

A policeman's affidavit should not be judged as an entry in an essay contest. It is not "abracadabra." [6]

---

[5] Although Spinelli's reputation standing alone would not, of course, justify the search, this Court has held that such a reputation may make the informer's report "much less subject to scepticism than would be such a charge against one without such a history." *Jones* v. *United States,* 362 U. S. 257, 271 (1960).

[6] See *Time, Inc.* v. *Hill,* 385 U. S. 374, 418 (1967) (dissent) (relating to jury instructions).

As the majority recognizes, a policeman's affidavit is entitled to common-sense evaluation. So viewed, I conclude that the judgment of the Court of Appeals for the Eighth Circuit should be affirmed.

MR. JUSTICE STEWART, dissenting.

For substantially the reasons stated by my Brothers BLACK and FORTAS, I believe the warrant in this case was supported by a sufficient showing of probable cause. I would therefore affirm the judgment.