See also D.C., 309 F.Supp. 829 and D.C., 309 F.Supp. 774.

**UNITED STATES of America,**

v.

**Samuel Joseph MELVILLE, John David Hughey, III, Jane Lauren Alpert, and Patricia Elizabeth Swinton, Defendants.**

**No. 70 CR. 28.**

United States District Court,
S. D. New York.

Feb. 17, 1970.

Lefcourt, Garfinkel, Crain, Cohn, Sandler & Lefcourt, New York City, for Samuel Joseph Melville, by William E. Crain, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, by John H. Doyle, III, and John R. Wing, New York City, of counsel.

## OPINION
### (Suppress Confession)

POLLACK, District Judge.

I find and decide on the totality of the facts and circumstances shown by evidence in the record that:

■ The government has established beyond a reasonable doubt that there was probable cause for the arrest of the defendant Samuel Joseph Melville by agents of the FBI on November 12, 1969; that the search of his person was incident to said arrest and was properly and lawfully conducted and the seizure of the articles found on him was lawful and that the said articles need not now be suppressed or returned to the defendant; and that no violation of defendant's rights under the Fourth Amendment occurred.

The agents who arrested the said defendant had reasonable grounds prior to the arrest for believing that said defendant was knowingly and wilfully committing or intending and about to so commit a violation of the laws against bombing of government military vehicles and the destruction of federal property.

The facts and circumstances within the knowledge of the arresting officers and their superiors in charge of the arrest and the matters and circumstances of which they had reasonably trustworthy information prior to the arrest and *on which they acted in arresting said* defendant were sufficient in themselves to warrant a man of reasonable caution and prudence to believe that said crime was intended, had been or was being committed; that the defendant was carrying a destructive bomb in an Army type shoulder satchel in the vicinity of where Army trucks were located and that defendant was armed at least with a tear gas "pen" which was seen by one of the agents protruding from the defendant's pocket. The officers had reason to believe that the said information on which they were acting came from a reliable informant whose reliability for accuracy and truth had been checked and verified by FBI in matters in which it had an official interest which provided a reliable index of him as an informant. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

■ The government has established beyond a reasonable doubt that the said defendant was lawfully advised of his constitutional rights and knowingly and with full understanding of his rights waived his privilege against self-incrimination and voluntarily made statements and answered questions put to him by the FBI at its headquarters on 69th Street in Manhattan on November 12–13, 1969 and these are admissible fruits of a lawful detention and lawful custodial interrogation.

Prior to custodial interrogation of said defendant following his arrest and on occasions during and just before the close of said interrogation, the FBI agents identified themselves as such and advised defendant of his constitutional rights; he was advised and fully understood prior to and during said interrogation, that: he had the right to remain silent; anything that he said and his answers to questions could be used against him in a court of law; he had the right to consult a lawyer of his own choosing before being asked any questions or answering any questions and to have a lawyer with him during questioning; and if he could not afford a lawyer, one would be appointed for him before any questioning, if he wished; that should he decide to answer any questions without a lawyer present, he would still have the right to stop answering questions at any time; and that he also had the right to stop answering at any time until he talked to a lawyer.

A custodial interrogation of said defendant followed said advice of rights in the course of which he made certain admissions and confessions without any promises or threats made to him and without the use of pressure of any kind to procure said admissions and confessions and the same were voluntary in every respect. The statements of the defendant thereat were not the product of any physical or psychological coercion nor was the defendant's will to resist the interrogation, should he so desire, overborne.

The evidence establishes beyond a reasonable doubt that the said defendant knowingly and intelligently waived his right to remain silent, to consult a lawyer for advice before being questioned and giving answers containing said admissions and confessions and to have a lawyer with him during the said questioning following his arrest. There is no credible evidence that the FBI knew or were told on or about November 3 or 12, 1969 or at any other time that the said defendant had consulted, employed or desired to consult with or have a lawyer present during said custodial or any other interrogation of the said defendant by the FBI and the testimony of the defendant and that of the witness Di-Suvero which is or may be deemed in any respect to the contrary is inconsistent with the facts and circumstances and probabilities and is unworthy of belief and not credited by the Court.

The testimony of the defendant concerning the interrogation was inconsistent, contradictory in material respects and not plausible. It lacked frankness and was unworthy of belief. His demeanor at key points contradicted his statements. In brief, there was every indication and it is fairly inferrable that his testimony was tailored for the purposes of the hearing. He is shrewd, quick and perceptive and understands how to fence with questions and his responses so indicated.

For example, he denied that he was questioned by the FBI following his arrest concerning whether he had placed a bomb anywhere; he testified that he was never specifically asked whether he had placed bombs in the several buildings that had suffered bomb damage. He did concede that he was questioned about a list of such buildings. But remarkably, his testimony was that he was not asked by FBI whether he was a participant in the bombing of those buildings and that he made no mention of any participation.

It was only a short time later in the hearing herein, that he acknowledged that he was asked about dynamite and about how many sticks he had used. He then admitted that the responses to the FBI were: "I said between 12 and 14", "I said that was between each job except the first" and on the first "job" "An undetermined amount in excess of 14", was used.

At the initial session of the hearing herein on December 31, 1969, the defendant Melville professed a lack of recollection of being advised of his constitutional rights. Initially also he testified that he was not sure that he had understood "even one line" of the so-called Waiver of Rights form that was handed to him reciting his "Miranda" rights. Soon thereafter he contradicted this testimony also and he admitted on cross-examination when the form was shown to him and asked to point to anything which was not comprehended by him, that he had understood every word in the form. At the second session of the hearing on January 21, 1970, he was recalled to the stand by his counsel and his version of the events during the interrogation was considerably reformed on the subjects of what he understood and why he furnished information to the agents which he now seeks to suppress. His contention in effect then was that he had given information to the FBI to keep the agency from rounding up others for questioning. He added that he believed he could speak freely to the FBI because he had not signed the waiver of rights form or a summary of the information which he had given. It is unclear whether he was also intimating

that the admissions he had made were false information.

Suffice to say, that the correct perspective emerged on cross-examination. He admitted that after his fingerprinting, he learned that his co-defendant Alpert had also been apprehended and was then in FBI headquarters (where he had seen her in passing) and when he was taken back to the interrogation room for further questioning, he responded without restraint; "I was afraid for others and I spoke freely".

The witness DiSuvero made a very poor appearance on the stand and the substance of his unsatisfactory responses are not credited as worthy of belief. The Court finds that he was not Melville's lawyer; he was not retained by him at any time; he had not accepted any professional commission or obligation as an attorney for Melville; and he did not act for him professionally either before or after the arrest. The vague testimony so far as it is credited, concerning an attempted phone call to someone at the FBI on or about November 3rd was not to the contrary of the foregoing. Indeed, Melville was not even represented by DiSuvero at the arraignment on the morning after the arrest— Melville had another lawyer at that time who is not claimed to have ever acted for him previously. DiSuvero seems to have been an acquaintance of defendant Alpert and apparently was present at her arraignment as an accommodation to her and in connection with her interests although he did not enter an appearance for her.

The FBI was not at any time notified that Melville was not to be interrogated in the absence of a lawyer and DiSuvero did not so notify the FBI.

The waiver by the defendant Melville of his Fifth Amendment rights was made, as stated above, knowingly and beyond reasonable doubt. He was offered counsel by the FBI, but voluntarily, intelligently and understandingly rejected the offer and "spoke freely".

The custodial interrogation of the defendant continued until he stated to the FBI agents that he did not wish to say more without consulting an attorney and upon such statement having been made the interrogation of the defendant immediately terminated.

Accordingly, the motions of the defendant Samuel Joseph Melville to suppress statements, admissions and confessions made by him on November 12–13, 1969 at FBI Headquarters in Manhattan and personal property seized from him at the time of his arrest and interrogation and the application for their return to him, are in all respects, denied.

So ordered.