UNITED STATES of America,
Plaintiff-Appellee,

v.

Brett Allen BURSEY and Frances Rut-
ledge Elliott, Defendants-Appellants.

No. 73-2483.

United States Court of Appeals,
Fifth Circuit.

March 22, 1974.

Cameron M. Cunningham (Court-ap-
pointed), Brady S. Coleman, Austin,
Tex., for defendants-appellants.

Anthony J. P. Farris, U. S. Atty.,
James R. Gough, Asst. U. S. Atty.,
Houston, Tex., for plaintiff-appellee.

Before BELL, THORNBERRY and
DYER, Circuit Judges.

DYER, Circuit Judge:

Bursey and Elliott were convicted in a
jury trial of possession with intent to
distribute peyote, a controlled substance,
in violation of 21 U.S.C.A. § 841(a).
On appeal they contend that two sepa-
rate automobile searches resulting in the
Government's discovery of the contra-
band were violative of their fourth
amendment rights. Because we find

this contention meritorious, we reverse the judgment below.[1]

As is usual in the search and seizure area, the particular factual setting is of critical importance to the disposition of this case. Viewed most favorably to the Government, the evidence adduced at trial showed that on December 5, 1971, Bursey and Elliott, a married couple traveling under an assumed name, were in the company of two other individuals, including co-defendant Charles Mann, in a green Chevrolet. On that date, this vehicle and its four occupants crossed the border into the United States from Mexico at the Roma, Texas port of entry, where the name of the fourth member of the party, Pat Panella, triggered the customs office computer or "cadpin" machine. The computer printout indicated that Panella had previously crossed the border in possession of marijuana seeds. On the basis of this information, surveillance was undertaken by two customs agents as the vehicle left the border station and headed for a motel in Roma. On the following morning, while the surveillance was continuing, the agents met with a reliable informant, who indicated that these four individuals were in town to purchase narcotics. The informant neither related any details of an anticipated transaction nor indicated the source of his information. Nonetheless, on the basis of this accumulated information, customs agents stopped and searched the car thoroughly, but without success, as the vehicle was proceeding from Roma toward McAllen, Texas, on the afternoon of December 6. Undaunted by this unfavorable result, the agents telephoned customs agents based in McAllen to inform them of these events and to advise them that the Chevrolet was headed toward McAllen.

Two days later, the customs agents in McAllen took up surveillance of two vehicles, a Dodge and an Oldsmobile, pursuant to another informant's tip that three persons driving these cars were staying at a local motel and intended to obtain narcotics in nearby Rio Grande City, Texas. The agents then determined that these individuals were three of the occupants[2] of the Chevrolet which had been searched earlier while it was en route to McAllen.

At approximately 9:00 p. m., minutes after the agents began surveilling the two cars at the motel, the Dodge was driven out of the parking lot, and the single agent in pursuit lost sight of the car. Surveillance was not re-established until approximately 3:30 a. m. the following morning when the agent returned to the motel and spotted the Dodge in the parking lot. Two agents remained at the motel observing the vehicles until approximately 11:00 o'clock, at which time the two cars were driven across the street from the motel to another parking lot. There, the drivers switched cars, with Bursey and Elliott getting into the Dodge and co-defendant Mann occupying the Oldsmobile. One agent again attempted to follow the Dodge, which appeared to him to be weighted down in the rear, but again lost surveillance of the vehicle in the traffic. At this point, the agent radioed instructions to his home office to alert a mobile border patrol checkpoint near Sarita, Texas, located approximately eighty miles north of McAllen, to intercept the Dodge. These orders were carried out, the Dodge was searched later that afternoon at the checkpoint without a warrant, and the peyote was uncovered. Armed with this information, several agents who had been following the Oldsmobile during the interim stopped that car near Refugio,

---

1. Our determination that the automobile searches were illegal renders a full discussion of the appellants' alternative contentions unnecessary. Suffice it to say that we find their arguments concerning the Government's destruction of the peyote and the unconstitutional vagueness of the substantive criminal statute entirely without merit.

2. Pat Panella, who had touched off the customs office computer in the first instance, was no longer accompanying the three co-defendants after their arrival in McAllen. Indeed, he had apparently left south Texas at some prior point.

Texas, located about one hundred and fifty miles from the border. The ensuing search of that car revealed another cache of peyote.

## BORDER SEARCH

■ At the suppression hearing, the Government sought to vindicate the warrantless search of the Dodge as a border search, despite the substantial distance between the Sarita checkpoint and the international boundary. The reason for the Government's proffering this rationale is readily apparent: the search was conducted at a mobile border patrol station, following an investigation by customs officials of possible smuggling, and pursuant to the express direction of a customs agent for the checkpoint officers in Sarita to conduct a "customs search." We are firmly convinced, however, that this justification is without constitutional foundation under the circumstances of this case. Since it is elementary that exceptions to the warrant requirement imposed by the fourth amendment are to be jealously and carefully delimited, see Coolidge v. New Hampshire, 1971, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564; Jones v. United States, 1958, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514, it is incumbent on the Government to demonstrate that this warrantless search fits within the parameters of the border search rationale. This burden has not, and indeed could not, be carried.

The evidence of record reveals no connection whatsoever between the vehicle searched at Sarita and the international boundary. The Dodge itself neither crossed nor came in direct contact with the border on any occasion. Neither informant's tip to customs agents contained any reference or intimation of a Mexican transaction or contact. See United States v. Garcia, 5 Cir. 1971, 452 F.2d 419, 420. On the contrary, the in-

formation relayed in the second tip indicated that the appellants would seek contraband in Rio Grande City, not in Mexico. Moreover, the agent's order to the checkpoint officers to search the vehicle was dispatched at a point approximately ten miles from the border, and the ensuing search was effected several hours later at a point almost one hundred miles from the border. More fundamentally, the border crossing at Roma, which occurred four days before the instant search, was the subject of conflicting testimony by Government witnesses, and in any event, the customs search at the port of entry and the subsequent search by the Roma customs agents on December 6 dissipated the nexus between these appellants and the border where there was no further evidence of another border crossing or direct contact with the boundary in any way. Under these circumstances, with no substantial connection of any sort with the border as of the time of the search, it strains credulity to characterize this incursion as a border search.[3]

## PROBABLE CAUSE

■ The Government argues alternatively that this search was based on probable cause and that exigent circumstances justified the warrantless incursion. This rationale was not advanced at the suppression hearing since the Government proceeded entirely under the border search theory, and we find this justification unavailing on appeal. The two informants' tips, which were instrumental in prompting the agents' intensive surveillance over a four-day period, are clear examples of what Mr. Justice Harlan characterized as "casual rumor[s] circulating in the underworld," Spinelli v. United States, 1969, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637, insufficient to support a finding of probable cause. There

3. In view of our determination that the search could under no circumstances be viewed as a border search, it is unnecessary to determine whether the Supreme Court's decision in United States v. Almeida-Sanchez, 1973, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596, narrowing the permissible definition of "border searches" has retroactive effect so as to apply to pre-*Almeida* searches.

was no indication in either instance of the basis of the informants' tips, nor was there related the detail suggestive of a credible basis for the information given by the informants. *See* Draper v. United States, 1959, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327; United States v. Sellers, 5 Cir. 1973, 483 F.2d 37. If presented to a detached magistrate for purposes of securing a search warrant, these informers' statements would have fallen far short of the standards set forth in Aguilar v. Texas, 1964, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L. Ed.2d 723, and Spinelli v. United States, 1969, 393 U.S. 410, 413, 89 S.Ct. 584, 21 L.Ed.2d 637. Since judicial scrutiny is even more exacting in instances of warrantless searches, it necessarily follows that these vague and generalized pieces of information related by the informants fail to sustain a finding of probable cause.

Moreover, the surveillance in this case, as in *Spinelli*, contained no reasonable suggestion of criminal conduct when the appellants' actions as observed are simply taken by themselves, and *Spinelli* clearly teaches that otherwise innocent conduct is not imbued with "an aura of suspicion by virtue of the informer's tip" where the tip fails to comport with the *Aguilar* requirements. *Spinelli, supra*, at 418, 89 S.Ct. 584, 590. Changing drivers in a public parking lot in broad daylight and an impression by an agent at the end of a long night's vigil that a car trunk was sagging more than it had the night before simply cannot, in themselves, warrant a finding of probable cause.

Significantly, the officers in this case acted throughout the investigation as if they lacked probable cause to conduct a warrantless search. During the entire four-day surveillance period, no affirmative action was taken to search either vehicle until an agent lost contact with the Dodge at a point when the car appeared to be heading away from the border town. It was only at this moment that the agent transmitted the order to intercept the vehicle and to conduct a "customs search" at a mobile border patrol checkpoint. Although clearly not dispositive of this issue, we nonetheless find the agents' conduct instructive, particularly in view of the impression entertained by the investigating officers that the search was in the nature of a border search, and thus to be effected under the more lenient finding of "reasonable suspicion."

The search of the Dodge was unlawful and the fruits of that search, including the contraband discovered in the Oldsmobile, were inadmissible at trial.

Reversed and remanded.