■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v GERARD SMITH, Respondent. — Order, Supreme Court, New York County (Howard E. Bell, J.), entered September 12, 1983, which granted the People's motion for renewal and reargument but adhered to the prior order, entered May 24, 1983, that granted the defendant's motion to suppress his postarrest statements made to the New York City police, is unanimously reversed, on the law and the facts, and the motion is denied.

The appeal from the prior order (same court), entered May 24, 1983, is dismissed as superseded by the appeal from the subsequent order, entered September 12, 1983, granting renewal and reargument.

On March 15, 1982, New York City Police Detective Timothy Stewart (Stewart) was conducting an investigation into recent robberies that had taken place at the IRT subway station located at 125th Street and Broadway in Manhattan. During the early afternoon of that day Stewart questioned a suspect by the name of Stanley Frazier (Frazier) concerning those robberies. In the course of the questioning, Frazier admitted that as to one of these robberies he had taken a woman's pocketbook, while the defendant, who is Frazier's friend, was across the street. Furthermore, as this discussion continued, Stewart asked Frazier about a homicide that had occurred in January, 1982 at this same subway station, and Frazier replied that the defendant was involved in that crime. A short time later Stewart, another detective and Frazier left the station house to look for the defendant in Frazier's neighborhood. As they were driving through that neighborhood, Frazier identified the defendant, who was standing in front of an apartment building located at 550 West 125th Street.

While Frazier was being returned to the station house, Stewart approached the defendant. He told the defendant that Frazier "had said he [defendant] was a friend of his [Frazier's] and that he [defendant] might be helpful to us in regard to our investigation that Stanley [Frazier] was implicated in." In response, the defendant acknowledged that he knew Frazier.

Next, Stewart asked defendant if he would be willing to come to the station house to "help clarify the matter", and the defendant agreed to do so.

At about 4:45 P.M. that afternoon, defendant and Stewart arrived back at the station house. The defendant was asked to wait in a room for a few minutes, and, at defendant's request, he was given access to a telephone to make a call. Now, Stewart went to another room to talk to Frazier, and Stewart again brought up the subject of the instant homicide. At this point Frazier disclosed that another one of Frazier's friends named Philip Scarborough (Scarborough) was also connected to this homicide. Upon the mention of Scarborough's name, Stewart once more left the station house to try and find Scarborough. He was unsuccessful.

When Stewart returned to the station house, at about 5:45 P.M., he conferred with Detective William Carreras (Carreras), who was in charge of the subject homicide investigation, in order to bring Carreras up to date on the day's developments in this case.

Subsequently, at about 6:00 P.M., Carreras questioned Frazier about the case. In substance, Frazier told Carreras that the defendant had admitted to Frazier that defendant had shot the person found in the mezzanine area of the subway platform, and that the defendant had left his "rifle" in Frazier's apartment. Following this oral statement by Frazier, Carreras asked him to reduce it to writing. Frazier complied and signed the resulting statement. In this statement, Frazier wrote, in pertinent part, that he, defendant and Scarborough had been together on the evening that the homicide took place; that defendant had proposed that they "do a vamp" since the defendant needed money; that Frazier and Scarborough rejected the defendant's proposal because it was too late in the evening and they went home; that "later that night [at] around 2:15 A.M. * * * [defendant] came up [to] my house shaking"; that Frazier said to defendant "what's up" and the defendant answered "I just shot somebody * * * on the train station"; that, when Frazier told the defendant to "stop playing it's to [sic] late for that", defendant said "feel the gun" and Frazier felt it; that, in addition, defendant told Frazier that, if Frazier still did not believe defendant, Frazier should go and look for himself; that thereafter Frazier accompanied by Scarborough went to the place where defendant had said he shot the victim and they saw "a body with a pudle [sic] of blood"; that, even later that same night, Frazier and Scarborough again saw defendant and defendant told them "that he was trying to rob [the victim] and pulled the trigger by mistake and he didn't

mean to shot [*sic*] him on the right side of his face under his eye"; and, that now defendant asked Frazier "to hold the gun in my house [and] I said allright and hid it in my closet. He later came back the next day at 12:00 clock [*sic*] to get the .22 caliber."

As soon as Frazier finished writing, at about 6:30 P.M., Carreras took the signed statement and left that room. Soon after that Carreras took defendant from the room in which he had been waiting and put defendant into an interview room. At that point, Carreras arrested defendant for homicide and advised him of his *Miranda* rights. Then defendant waived these rights and made incriminating statements to Carreras as well as to New York City Transit Police Detective Gerald Gallagher (Gallagher).

Subsequent to defendant's indictment for the crime of murder in the second degree (Penal Law, § 125.25) and related crimes, he moved, *inter alia,* to suppress the statements that he had made to Detectives Carreras and Gallagher. The court conducted a hearing and then granted defendant's motion to suppress his statements, upon the basis that Frazier's information given to the police about the homicide did not constitute probable cause to arrest defendant. We disagree.

We find that the oral and written statements that informant Frazier provided to Carreras established the probable cause needed to justify defendant's arrest since the information contained in those statements was sufficiently detailed to indicate both Frazier's reliability as an informant and the basis of his knowledge that the defendant committed the crime (*Aquilar v Texas,* 378 US 108, 114; also, see *Spinelli v United States,* 393 US 410, 415-418). For example, Frazier's reliability was demonstrated by (1) his exact knowledge of where the defendant had killed the victim, to wit: the mezzanine area of the subway platform, and that the victim was male, which information "corresponded exactly with information already in the possession of the police" (*People v Rodriguez,* 52 NY2d 483, 490), and (2) his admission that he had hidden the defendant's murder weapon, which was a statement "against his own penal interest * * * [and i]t is highly unlikely that he would have incriminated himself unless the statements were true" (*People v Restrepo,* 87 AD2d 320, 324). Moreover, Frazier's "basis of knowledge" was evidenced by his firsthand information that (1) the defendant had admitted to him that defendant had shot the victim on the right side of the face under the eye in the subway station, and (2) that the defendant, within a short time after the shooting, had asked Frazier to feel the gun, which was all "information of such quality * * * that a reasonable observer would be warranted in

determining that * * * [this] knowledge * * * led logically to the conclusion that a crime had been * * * committed" (*People v Restrepo, supra,* at pp 323-324). Accordingly, we find that probable cause existed to justify the defendant's arrest, and, therefore, the court erred in suppressing this defendant's statements. Concur — Kupferman, J. P., Sandler, Sullivan, Ross and Asch, JJ.