[No. 629-1.    Division One—Panel 1.    June 14, 1971.]

THE STATE OF WASHINGTON, *Respondent*, v. LEROY ARNOLD HARRISON, *Appellant*.

*Kempton, Savage & Gossard* and *Anthony Savage, Jr.,* for appellant.

*Christopher T. Bayley, Prosecuting Attorney,* and *James J. Lamont, Deputy,* for respondent.

UTTER, J.—Leroy Harrison appeals his conviction of the crime of bookmaking. The sole issue raised by the six assignments of error is whether a sworn affidavit for a search warrant signed by a federal agent established probable cause to believe that interstate gambling was being conducted in certain premises. We hold probable cause was established and affirm the conviction of the defendant.

Clifford Winkler, Jr., Truman Adair Ordell, and Leroy Harrison were charged with the crime of bookmaking, and

Winkler and Harrison were found guilty. Prior to the arrest of Harrison and his codefendants, an affidavit was signed by a federal agent alleging he had reason to believe that in an apartment specifically listed in Seattle, there was property being concealed relating to the operation of a gambling business in violation of federal laws prohibiting interstate gambling. A search warrant was issued for the apartment, based upon the agent's affidavit, and upon executing it, Harrison and the others were arrested inside the apartment. Considerable gambling and bookmaking paraphernalia, later introduced at trial, over objection, as state's exhibits, were seized.

The basis for attacking the issuance of the search warrant is that the affidavit[1] did not establish that probable

[1] "On September 25, 1969, Informant No. 1 advised the undersigned that he has placed sporting bets with Clifford Winkler, Jr., for years including the day following Winkler's arrest by the FBI in 1965 and up to the last month or so. These bets are usually on out-of-state horse racing events. He knew Winkler by the name of George, initially, and later recognized him as being Winkler by reason of the publicity surrounding his federal prosecution in 1965. He has viewed photographs of Winkler and has identified them as depicting the man with whom he has made bets. He has seen Winkler driving a red Ford convertible. Other than his betting, as described above, this informant appears to the undersigned to be a law abiding citizen and has frankly stated his knowledge of these activities. He has no criminal record. The information he has provided has been proved accurate by other sources. He is not known to me or to other law enforcement agencies in any other regard.

"In July 1969, Informant No. 2 advised the undersigned that for a period of approximately a year and one half prior to June 1969, he did gambling business with Clifford Winkler at Winkler's request. He was given a code name and told to use it when phoning in bets to the booking number given him by Winkler. The number was PA3-9330. He has not done business with Winkler since that time. He knew Winkler by the names of "J. R." and Junior and observed him riding in a red Ford convertible. He has viewed photographs of Winkler and has identified them as depicting the man with whom he has done business in the past. The bets he placed with Winkler were for horse races usually out of the State of Washington. This informant is known to the undersigned only with regard to this case. The information given by him has been checked out by me and found to be accurate. He has no prior record with regard to any law enforcement agency that is known to me.

"For approximately one year, Informant No. 3 has advised the

cause existed to believe interstate facilities were being used to conduct the gambling operations. An analysis of the affidavit indicates the first informant usually placed bets with one of the defendants on out-of-state horse racing events and was aware that defendant Clifford Winkler had been previously arrested and successfully prosecuted for violation of interstate gambling statutes.

undersigned on various occasions that he has done gambling business with Clifford Winkler and continues to do so up to the present time. He (Winkler) operates with others, including Leroy "Rex" Harrison, Frank Bartenetti, Elmer Malick, Aldo Cresto and others, in an apartment (Apartment 509) at 600 W. Olympic Place, Seattle, Phones AT4-0244 and AT4-0245, with four telephone sets, where the bets are phoned in by bettors and other bookies. Code names are used by all callers so that the business or "action" can be attributed by the person answering the phone to the proper bookie. Proceeds are figured and distributed to each bookie on Mondays. He states that other bookies purchase the "line" or "odds" information from Winkler who in turn obtains it from out of state. All sporting events all over the country are handled through this operation. He states that this operation was previously operated from 7621 *Rainer* Avenue South, Seattle, Phones PA3-9330 and PA3-9331. This informant is known to me since September 1967 and has provided accurate information on numerous occasions in the past. His reliability has proven to be excellent.

"The undersigned is personally familiar with Clifford Winkler, Jr., he is aware that Winkler goes by the names of George Roberts, "J. R." and Junior. He is further aware that Winkler is the same person successfully prosecuted in this district in 1965-67 for a violation of 18 U.S.C. §§ 1084 and 1952.

"On May 12, 1969, a Seattle Police Officer observed and photographed Winkler at the premises known as 7621 *Rainer* Avenue South, Seattle. From the fall of 1968 to April 1969, I personally observed cars parked outside this address which I had previously observed being driven by Frank Bartenetti, Leroy Harrison, and Clifford Winkler. Another agent of the FBI observed Aldo Cresto entering these same premises on September 27, 1968.

"On February 22, 1969, the King County Sheriff's department arrested Elmer Malick while in possession of gambling paraphernalia. In my personal inspection of the material seized incident to this arrest, I noticed that the entire seizure contained the necessary notes and records for operating a gambling operation known as a sporting book; it showed gambling transactions between Malick and "J. R.". It also contained a manila envelope addressed to Elmer Misque with a return address of George Roberts, 423 E. Pike, Seattle. This address was at the time the business address of a man known to be a gambler and close associate of Winkler. It contained A & K sports schedules from Chicago. It contained "line" information which in my experience would have to

The second informant told agent Smith that for approximately 1½ years prior to June of 1969, he had done gambling business with Winkler and that the bets he placed were for horse races usually held outside the state of Washington.

The third informant advised agent Smith that he had conducted gambling transactions with Winkler for approximately 1 year prior to the issuance of the affidavit. Other bookies purchased "line" or "odds" information from Winkler who in turn obtained the information from outside the state of Washington. All sporting events from all over the country were held through Winkler's gambling operation. The affidavit further reflected that an associate of Winkler's had been previously arrested with information on sporting schedules from Chicago in his possession and that the en-

---

have come from out of state and which was and is necessary to the operation of any such gambling business.

"In June, July and August 1969, members of the Seattle Police Vice Squad and the undersigned observed cars used by Winkler and Harrison parked in the vicinity of 600 W. Olympic Place, Seattle. On Monday, September 29, 1969, Winkler was observed by the agents of the FBI inside apartment 509, 600 W. Olympic Place, and was seen to leave in the company of Leroy Harrison. On October 6, 1969, Winkler, Harrison and Bartenetti were observed by the undersigned and other agents of the FBI to enter 600 W. Olympic Place at different times. At approximately 11:30 a.m., Winkler was observed to place what appeared to be a short wave radio in the east-facing window of Apartment 509. (From five years of experience in the investigation of gambling operations while an agent of the FBI, I have found that short wave radios are sometimes used to obtain immediate results of distant sporting events.) Persons, including Winkler, Harrison and Bartenetti, were observed to examine papers, including what appeared to be an adding machine tape.

"From my experience in gambling investigations, I believe that several bookies, including Malick and Winkler and probably others, are operating a substantial part of their gambling business together at Apartment 509, 600 W. Olympic Place, Seattle, and that there will necessarily be present in the apartment evidence of the interstate communication of wagering information.

"/s/ CLARK SMITH, Special Agent
"Federal Bureau of Investigation
"SUBSCRIBED AND SWORN TO before me this 10th day of October, 1969.
"/s/ HAROLD W. ANDERSON
"United States Commissioner"

velope in which the information was contained had a return address on it listing an alias of Winkler's. The affidavit also stated that this informant had observed Winkler placing a short-wave radio in an east-facing window of the apartment and that on the basis of agent Smith's experience, short-wave radios were used to obtain immediate results of distant sporting events.

The reliability of the informants is not questioned by Harrison, and the content of their information as set out in the affidavit is the sole question before us.

■ To rise to the level of probable cause, the courts consider only probabilities, and a prima facie showing of criminal activity is not required. Affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial and, in judging probable cause, issuing magistrates are not to be confined by restrictions on the use of good common sense. Their determination of probable cause should be paid great deference by reviewing courts. *Spinelli v. United States,* 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969); *State v. Barnes,* 76 Wn.2d 234, 456 P.2d 337 (1969). Probable cause exists where "the facts and circumstances within their [the arresting officers] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. *Carroll v. United States,* 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280, 288 (1925).

■ The information of the third informant, set forth in the affidavit, would be sufficient, without reference to the other informants, to establish probable cause to believe interstate activities were taking place, if his statements could be credited as worthy of belief by the magistrate. Harrison attacks this informant's information as failing to set forth, with sufficient specificity, the underlying circumstances from which the informant reached his conclusion. He contends *Spinelli v. United States, supra* and *Aguilar v. Texas,* 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964)

compel the conclusion that the magistrate would be unable to consider these allegations in the affidavit. Harrison specifically complains of the failure of the affidavit to set out where this particular informant obtained the information, how he obtained it—whether by telephone, mail, or telegraph—when he obtained it, whether Winkler admitted to the informant he did what was alleged, in what manner the informer obtained the information, and lastly on what basis the informant did gambling business with Winkler.

The court in *Spinelli* indicated a magistrate could not consider information in an affidavit in that case inasmuch as:

> Though the affiant swore that his confidant was "reliable," he offered the magistrate no reason in support of this conclusion. Perhaps even more important is the fact that *Aguilar*'s other test has not been satisfied. The tip does not contain a sufficient statement of the underlying circumstances from which the informer concluded that Spinelli was running a bookmaking operation. We are not told how the FBI's source received his information — it is not alleged that the informant personally observed Spinelli at work or that he had ever placed a bet with him. Moreover, if the informant came by the information indirectly, he did not explain why his sources were reliable. . . . In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation.

Although the questions raised by Harrison are not answered in detail in the informant's tip set forth in the affidavit, there is no question about the reliability of the informer. In addition, sufficient facts are set forth in the affidavit to indicate that informer No. 3 had personally done gambling business with Winkler and Harrison and sufficient detail is set forth to indicate he was personally present at the premises where the gambling took place. These factors distinguish the present case from *Spinelli*

and, although, more information undoubtedly would have been required at trial to prove the truth of the informer's statements beyond a reasonable doubt, this is not the standard necessary to establish "probable cause."

Inasmuch as the statement of informer No. 3 was sufficient standing alone to establish a basis upon which the magistrate's exercise of discretion can be upheld, we do not comment on the other informants' allegations contained in the substantiating affidavit for the search warrant, except to point out that they establish a high degree of internal corroboration of the stories and thereby aid in establishing probable cause.

The judgment of the trial court is affirmed.

FARRIS, A.C.J., and WILLIAMS, J., concur.