Lula Mae McCurley was indicted by the September, 1977, session of the Mobile County grand jury for violation of the Alabama Uniform Controlled Substances Act, Title 22, § 258 (25) through 258 (60), Code of Alabama 1940, Recompiled 1958, 1973 Cum.Supp. (now §§ 20-2-1 through 93, Code of Alabama 1975). The indictment charged five counts of possessing illegal drugs: (1) codeine, (2) pentazoeine, (3) chlorazepate, (4) diazepam, and (5) d-amphetamine sulfate. This case was tried by the court without the intervention of a jury. After hearing the evidence the trial court returned a judgment of guilty on counts 1, 2, 3, and 5; and granted the appellant's motion to exclude as to count 4. The trial court sentenced the appellant to four years imprisonment in the penitentiary, ordered that twelve months of the sentence be served in the Mobile County Jail and suspended the remainder of the sentence pending good behavior. In addition he ordered that she be placed on probation at completion of the sentence. The appellant's retained trial counsel represents her on this appeal. *Page 17 
Bobby W. Brown, an investigator for the Alabama Department of Public Safety's narcotics unit, testified that during October, 1976, he worked in the Mobile area as a backup to contract agent (informant) Juanita Sorrells. On October 25, 1976, Brown and Sorrells went before Judge Thomas Sweeney to secure a search warrant for the Terrace Motel. Sorrells signed the search affidavit in support of the search warrant as the affiant.
According to Brown, Sorrells testified under oath before Judge Sweeney that 1) she had stayed at the Terrace Motel on different occasions, 2) she had been given and had purchased drugs from the appellant and Jimmy Eugene McCurley, 3) the appellant had stated that a shipment of morphine was expected at the motel on a certain date, and 4) she and the appellant talked about the appellant's involvement in transporting drugs to prisons-how they were carried in, etc.
A search warrant was issued to Brown on October 25, 1976, but was never executed. No explanation was given. The next day, October 26, Brown went back to Judge Sweeney alone and obtained another search warrant for the Terrace Motel. This one was executed in this case. In support of the second search warrant Brown testified under oath before Judge Sweeney as to the facts related earlier by Sorrells. In addition Brown testified that he had the Terrace Motel under surveillance for the past sixty days. Brown signed the affidavit in support of the second search warrant.
At trial Brown testified that during the period of his surveillance of the Terrace Motel he saw different agents in his employ go in and meet with the appellant on different occasions. Brown saw what he assumed were drug transactions taking place in the driveway of the motel but could not see actual drugs being passed. He took photographs of the alleged drug transactions on different occasions.
Brown testified that Juanita Sorrells was in the Mobile area approximately three months. The last contact he had with her was latter 1977 or early 1978. He did not know her present whereabouts.
Marion Pugh, an investigator for the District Attorney's Office, testified that on October 26, 1976, he executed a search warrant at the Terrace Motel, 4153 Government Boulevard, Mobile County, Alabama. Pugh served the warrant on the appellant and her husband, Edward McCurley, and made the return on the warrant to Judge Sweeney the next day.
Participating in the search were approximately six officers, including Pugh, Investigator Brown, and Dr. Small. The Terrace Motel consists of three groups of buildings-a residence, an office, and 15-20 rental rooms. It is all one area off Highway 90. Entry was made without force to the residence portion of the motel. Present in the residence portion at the time of the search were the appellant, Edward and Jimmy McCurley.
James L. Small, Toxicologist for the Department of Forensic Sciences, testified that he was custodian of the evidence during the search of the Terrace Motel. As officers located items of evidence, Dr. Small would take custody of each item and record where and who found it.
The defense counsel stipulated as to Dr. Small's qualifications and waived the laying of predicate of chemical tests for identification. The following items were identified by Dr. Small and admitted into evidence.
 1.) State's Exhibit # 5: a clear vial with no prescription label containing white tablets identified as Acetaminophen and Codeine. This was found in a purse containing the appellant's drivers license.
 2.) State's Exhibit # 6: a sealed container of 100 pink tablets identified as Pentazocine (Talwin). This was recovered from the same purse as Exhibit # 5.
 3.) State's Exhibit # 7: a vial containing two small pink tablets identified as Pentazocine (Talwin). This was recovered from the same purse as Exhibit # 5. This vial contained a prescription label for a Mrs. Davenport, later identified as the appellant's sister. *Page 18 
 4.) State's Exhibit # 8: five white tablets identified as Codeine (Tylenol # 4). These were found in plain view on top of a dresser in one of the residence bedrooms.
 5.) State's Exhibit # 9: a vial containing seven maroon and gray capsules identified as Chlorazepate (Tranzene). The vial contained a partially torn prescription label in the appellant's name indicating that the prescription was for Valium (Diazepam). This evidence was found behind the registration counter in the motel office.
 6.) State's Exhibit # 10: a vial containing one small pink tablet identified as Pentazocine (Talwin). The prescription label on the bottle was to James McCurley and indicated that the contents should have been Empirim # 3 (Codeine). This evidence was found beneath the mattress of one of the day beds in the motel office.
 7.) State's Exhibit # 12: a vial containing 24 brown and clear capsules identified as D-Amphetamine Sulfate. This was found in the hall closet of the residence. This bottle contained a prescription label in the appellant's name.
 8.) State's Exhibit # 13: a brown vial containing 139 maroon and gray capsules identified as Chlorazepate (Tranzene). Dr. Small first testified that this evidence was found on a nightstand next to a bed in one of the residence bedrooms, but he later testified it was recovered from beneath the mattress of one of the day beds in the motel office.
 9.) State's Exhibit # 14: a bottle containing nine pink tablets identified as D-Amphetamine Sulfate and Butabarbital. The evidence was found beneath the mattress of one of the day beds in the motel office.
Dr. Small testified that the motel office has two entrances, one on each end. Inside the office is a lobby area and a counter for registering. Two day beds are located behind the counter area. The appellant was not present in the office when the evidence was recovered there. He did not know who worked in the office. He also did not know who occupied which bedroom in the residence.
Investigator Brown was recalled as a witness for the state. He testified that he recovered the purse containing State's Exhibits # 5, 6, and 7 on the dining room table of the residence and that the appellant admitted it was her purse. He also stated that the hall closet in which State's Exhibit # 12 (D-Amphetamine Sulfate) was found was opened with a key produced by the appellant.
Brown further testified that the motel office, the residence, and the rental rooms were separate buildings but it was all located on one piece of property. During his investigation of the appellant he ascertained that she lived in the residence portion and that she was the operator of the motel. She gave her occupation as motel operator of the Terrace Motel on some forms she filled out during the search.
Brown also testified that the residence contained three bedrooms. He did not know who occupied which room.
At this point the state rested its case. The defense counsel made a motion to exclude the evidence on several grounds. The trial court granted his motion as to count 4 only.
The first witness for the appellant was Bessie Davenport, sister of the appellant. Mrs. Davenport owned the Terrace Motel in 1976 and was there everyday in 1976. She never saw any drugs sold there. Mrs. Davenport named several people who had access and had keys to the motel office: the appellant, Jimmy McCurley, Betty Cornelison, Bobby Cornelison, a white maid named Jeanette Walker, a black maid, Ed McCurley, and herself.
Mrs. Davenport testified that State's Exhibit # 7 [Pentazocine (Talwin)] was hers and that the appellant had been in possession of it with her permission. Mrs. Davenport was taking Talwin under prescription from a doctor. She left the drug at the appellant's residence by mistake while visiting. Mrs. Davenport telephoned the appellant and asked her to put the Talwin in her *Page 19 
purse and keep it until she could return to pick it up. She also testified that State's Exhibit # 6 [Pentazocine (Talwin)] looked like her bottle of Talwin.
Betty Cornelison testified that the appellant is her mother. Mrs. Cornelison testified that the appellant, her father, brother Jimmy, son Bobby, and two maids live at the motel. The hall closet in the residence contains articles belonging to the appellant, her brother, and herself. Mrs. Cornelison possesses a key to the closet.
Mrs. Cornelison testified that she works at the motel. She stated that four or five people are behind the office counter on any given date. She testified that State's Exhibit # 6 is a container of Talwin that she found in rental room # 8 a day or two before the search. Mrs. Cornelison turned the pills over to the appellant. She has found other pills in rental rooms in the past. The policy of the motel is to keep articles that are found in rental rooms for a period of time to see if someone would claim them.
Ronald Adams, ex-husband of Betty Cornelison, testified that he was at the motel frequently. He testified that the day beds in the office are used by all to rest when business is slow. He also testified that Bobby occupies the east bedroom.
The appellant then rested. There was no request for the affirmative charge and no motion for new trial.
 I
Before the trial of this case the appellant filed a motion to suppress the evidence claiming that it was illegally seized. The motion was taken under submission during the trial and eventually overruled. The appellant contends on appeal that the trial court erred in overruling her motion to suppress because the affidavit in support of the search warrant did not meet the requirements of the second "prong" of the Aguilar[1] test, i.e., that there were insufficient facts in the affidavit to establish the credibility of the informant.
The affidavit in question was executed by Investigator B.W. Brown of the Alabama Bureau of Investigation on October 26, 1976, before Judge Thomas Sweeney. The pertinent portion of the affidavit appears as follows (State's Exhibit 3, R.P. 51):
 "My name is B.W. Brown, I am an Investigator for the State of Alabama, Department of Public Safety, Bureau of Investigation, Narcotics Unit. I have received information from an informant who has proven reliable in the past. This informant has worked as an informant for the Georgia Bureau of Investigation, for approximately four months and has furnished them with information which has led to several narcotics arrests in the State of Georgia. This informant has been working in an undercover capacity for the Department of Public Safety for approximately three months. The informant has told your affiant that within the last thirty days the following events have taken place at the above described location:
 "1. The informant has made several purchases of valium from Lula McCurley;
 "2. The informant has been given valium by Jimmy Eugene McCurley;
 "3. The informant was given several capsules within the last four days by Lula McCurley. These capsules were represented to the informant as something to help the informant sleep;
 "4. On October 22, 1976, the informant was told by Lula McCurley that she (Lula McCurley) would be receiving a shipment of valium in the next few days;
 "5. On October 24, 1976, Lula McCurley told the informant that she was sending Jimmy Eugene McCurley to pick up a shipment of liquid morphine that should be at the above described location on October 26, 1976.
 "Your affiant has personally observed the above named subjects using the above described vehicles at the above described location within the last sixty days. Your *Page 20 
affiant has surveilled the above location during the past sixty days and has observed numerous persons accompanying the above named subjects to numerous locations on the premises.
 "Due to the above information we respectfully request the issuance of this search warrant."
Aguilar, supra, sets out a two-pronged test that must be met in order that an affidavit based on hearsay information may be approved for the issuance of a search warrant: the magistrate must be informed of 1) the underlying circumstances from which the informant concluded that the items to be seized were where he claimed they were, and 2) the underlying circumstances from which the affiant concluded that the informant is a credible person or his information reliable. In addition, Spinnelli v.United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637
(1969), requires that the underlying circumstances be in sufficient detail so as to inform the magistrate that the information he is relying on in the affidavit is "something more substantial than a casual rumor." 393 U.S. 416,89 S.Ct. 589.
In this particular case we are only concerned with the second "prong" of the Aguilar test. Our Supreme Court has approved the use of the assertion, "I have received information from a person whose record of reliability for correctness has been good," as sufficient to support the second "prong" of Aguilar.Neugent v. State, Ala., 340 So.2d 52, cert. den. 430 U.S. 969,97 S.Ct. 1653, 52 L.Ed.2d 361 (1977); Davis v. State, 286 Ala. 117, 237 So.2d 640 (1970). The following assertion was used in the affidavit in this case, "I have received information from an informant who has proven reliable in the past." This is essentially the same assertion approved in Neugent and Davis.
In addition this affidavit goes on to reveal specific supporting circumstances for the reliability or credibility of the informant: 1) prior proven reliability of the informant for the Georgia Bureau of Investigation, 2) the informant has been working in an undercover capacity for the affiant's agency during the prior three months, 3) the personal and recent observation of criminal activity by the informant including specific instances, and 4) the affiant's personal surveillance of the location in question during the informant's activities there. We conclude that the affidavit in the present case contained an ample factual basis for believing the informant was credible or reliable. United States v. Harris,403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).
In addition to and in support of the above, the day prior to the execution of the affidavit by Investigator Brown, the informant herself, Juanita Sorrells, swore to an affidavit before the very same Judge Sweeney. The pertinent portion of that affidavit is as follows (see testimony of Investigator Brown, R.pp. 42-58):
 "Since the middle of September, 1976, I have made several purchases of Valium from Lula M. McCurley and have been given Valium by Jimmy Eugene McCurley at the Terrace Motel.
 "On Friday, October 22, 1976, Lula M. McCurley gave me nine (9) red and gray capsules stating that it would help me sleep.
 "On Sunday, October 24, 1976, Jimmy Eugene McCurley stated that he had some Talwin that he would sell me.
 "On Sunday night, October 24, 1976, Lula M. McCurley stated that she was going to send Jimmy Eugene McCurley to get some liquid morphine and talwin and should have it by Tuesday, October 26, 1976.
 "All of the above situations happened at the Terrace Motel in September and October, 1976.
 "The above automobiles have been used for transportation by Lula M. McCurley and Jimmy Eugene McCurley.
 "I therefore request a search warrant to search the above described premises, described vehicles, and described trailer."
Considering that the informant herself testified under oath before Judge Sweeney, the closeness in time between the two affidavits of the informant Sorrells and Investigator *Page 21 
Brown, and the factual content of the affidavits, there can be no doubt that there was an ample indication of the credibility of the informant upon which Judge Sweeney could reasonably issue a search warrant.
 II
The appellant claims that the trial court committed reversible error by refusing to grant her motion to exclude the evidence as to counts 1, 2, 3, and 5 of the indictment. A motion to exclude must state proper specific grounds or it may be properly overruled. Espey v. State, 270 Ala. 669,120 So.2d 904 (1960).
 Count 1
Count 1 charged possession of codeine and was identified as State's Exhibits No. 5 and No. 8. Exhibit No. 8 was found in plain view on top of a dresser in one of the bedrooms. There was no evidence as to who occupied this bedroom. The appellant claimed that the state did not prove her dominion and control over that bedroom. Knowledge of the presence of illegal drugs may be established by circumstantial evidence, and guilt does not depend upon ownership. Henderson v. State, Ala.Cr.App.,347 So.2d 540, cert. quashed, Ala., 347 So.2d 543 (1977). Evidence was offered at trial that the appellant had conducted drug transactions at the Terrace Motel, the appellant had substantial control over the motel, she was present during the search, and, as will be shown next, she was in actual possession of additional codeine. These are sufficient circumstances to provide a connection between the appellant and the illegal drugs. Temple v. State, Ala.Cr.App., 366 So.2d 740
(1978).
Exhibit No. 5 was the codeine found in the appellant's purse. Investigator Brown testified that during the search the appellant stated "I have to get my purse," she grabbed the purse and Brown took it away from her. The appellant contends that the appellant did not have specific knowledge that the drug in the vial was codeine or that it was illegal. We believe the appellant evidenced a consciousness of guilt by attempting to hold on to the purse and by actual possession of the purse, thus proving guilty knowledge. Temple, supra.
 Count 2
Count 2 of the indictment charged possession of pentazocine and was identified as State's Exhibits No. 6, 7, and 10. The appellant in her motion to exclude made the same arguments for this count as she did for count 1 — no dominion and control, no specific knowledge. Exhibits No. 6 and 7 were found in the same purse as Exhibit No. 5. Exhibit No. 10 was found under the mattress of the day bed in the motel office. We cite our reasoning under the section on count 1 in support of our conclusion that count 2 was properly proven.
The appellant makes the contention on appeal that Exhibit No. 7 was a lawful prescription of the appellant's sister, Mrs. Davenport. This point was not raised at trial by objection or motion to exclude. We believe Mrs. Davenport's explanation at trial to be a valid explanation of the appellant's possession of the drug. But, even if Exhibit No. 7 were excluded from evidence, there has been proper proof of possession of Exhibits No. 6 and 10, thus count 2 is still proven.
 Count 3
Count 3 of the indictment charged possession of chlorazepate and was identified as State's Exhibits No. 9 and 13. Exhibit No. 9 was found behind the registration counter in the motel office. The testimony by Dr. Small is contradictory as to where Exhibit No. 13 was found. At one point he stated it was found on a nightstand in one of the residence bedrooms. Later he stated it was found beneath the mattress of one of the day beds in the motel office. The appellant's grounds for her motion to exclude on this count alleged failure to prove constructive possession and lack of proof of dominion and control. We again refer to our reasoning under the section of count 1 of this opinion for our conclusion on this issue. We might also add that the substance contained *Page 22 
in Exhibit No. 9 was not the substance indicated on the bottle as being prescribed for the appellant.
 Count 5
Count 5 of the indictment charged possession of d-amphetamine sulfate and was identified as State's Exhibits No. 12 and 14. Exhibit No. 12 was found in the hall closet of the residence. Exhibit No. 14 was found beneath the mattress of one of the day beds in the motel office. The appellant in her motion to exclude alleged that the state failed to prove dominion and control on Exhibit No. 12 and that Exhibit No. 12 was a lawful prescription of the appellant. There is evidence in the record, though somewhat vague, that Exhibit No. 12 is a prescription for the appellant. Even if we give the appellant the benefit of the doubt and exclude Exhibit No. 12, the appellant's argument still fails. There was no motion to exclude as to Exhibit No. 14, therefore the count still stands.
After a careful review of the evidence as to all counts, we are convinced that the state proved a prima facie case.
 III
The appellant contends that the Alabama Uniform Controlled Substances Act is an unconstitutional delegation of legislative power and is violative of her due process rights. The constitutional question was raised at trial court by motion to quash the indictment.
The appellant specifically focuses on Title 22, § 258 (26), Code of Alabama 1940, Recompiled 1958, 1973 Cum.Supp. (now §20-2-20, Code of Alabama 1975). This section is set out as follows:
 "(a) The state board of health unless otherwise specified shall administer this chapter and may add substances to or delete or reschedule all substances enumerated in the schedules in sections 258 (29), 258 (31), 258 (33), 258 (35), or 258 (37) of this title pursuant to the procedures of the state board of health. In making a determination regarding a substance, the state board of health shall consider the following:
"(1) The actual or relative potential for abuse:
 (2) The scientific evidence of its pharmacological effect, if known; (3) The state of current scientific knowledge regarding the substance;
(4) The history and current pattern of abuse;
(5) The scope, duration, and significance of abuse;
(6) The risk to the public health;
 (7) The potential of the substance to produce psychic or physiological dependence liability; and
 (8) Whether the substance is an immediate precursor of a substance already controlled under this article.
 "(b) After considering the factors enumerated in subsection (a) the state board of health shall make findings with respect thereto and issue a rule controlling the substance if it finds the substance has a potential for abuse.
 "(c) If the state board of pharmacy designates a substance as an immediate precursor, substances which are precursors of the controlled precursor shall not be subject to control solely because they are precursors of the controlled precursor.
 "(d) If any substance is designated, rescheduled, or deleted as a controlled substance under federal law and notice thereof is given to the state board of health, the state board of health shall similarly control the substance under this chapter after the expiration of 30 days from publication in the federal register of a final order designating a substance as a controlled substance or rescheduling or deleting a substance, unless within that 30-day period, the state board of health objects to inclusion, rescheduling, or deletion. In that case, the state board of health shall publish the reasons for objection and afford all interested parties an opportunity to be heard. At the conclusion of the hearing, the state board of health shall publish its decision, which shall be final unless altered by statute. Upon publication of objection to inclusion, *Page 23 
rescheduling, or deletion under this chapter by the state board of health, control under this chapter is stayed until the state board of health publishes its decision.
 (e) Authority to control under this section does not extend to distilled spirits, wine, malt, beverages, or tobacco.
 "(f) The state board of health shall exclude any nonnarcotic substance from a schedule if such substance may, under the Federal Food, Drug and Cosmetic Act, the Federal Comprehensive Drug Abuse Prevention and Control Act of 1970, and the law of this state be lawfully sold over the counter without a prescription. (1971, No. 1407, p. 2381, § 201, appvd. Sept. 16, 1971.)" (Emphasis supplied)
 A
The question of whether § 258 (26), supra, is an unconstitutional delegation of legislative authority to the State Board of Health was considered and ruled upon favorably by this Court in Cassell v. State, 55 Ala. App. 502,317 So.2d 348 (1975), and followed in Napier v. State, Ala.Cr.App.,338 So.2d 463 (1976).*
The case of State v. Lisk, 21 N.C. App. 474, 204 S.E.2d 868, cert. den., 285 N.C. 666, 207 S.E.2d 759 (1974), addressed the question of whether the authority of the North Carolina Commission of Health Services to add, delete, or reschedule a substance as a controlled substance was an unconstitutional delegation of legislative power:
 "However, it is not necessary for the Legislature to ascertain the facts of, or to deal with, each case. Since legislation must often be adapted to complex conditions involving numerous details with which the Legislature cannot deal directly, the constitutional inhibition against delegating legislative authority does not deny to the Legislature the necessary flexibility of enabling it to lay down policies and establish standards, while leaving to designated governmental agencies and administrative boards the determination of facts to which the policy as declared by the Legislature shall apply. . . . Without this power, the Legislature would often be placed in the awkward situation of possessing a power over a given subject without being able to exercise it.
 "Here we pause to note the distinction generally recognized between a delegation of the power to make a law, which necessarily includes a discretion as to what it shall be, and the conferring of authority or discretion as to its execution. The first may not be done, whereas the latter, if adequate guiding standards are laid down, is permissible under certain circumstances. 11 Am.Jur., Constitutional Law, Sec. 234. (Citation omitted)
* * * * * *
 "Nevertheless, the legislative body must declare the policy of the law, fix legal principles which are to control in given cases, and provide adequate standards for the guidance of the administrative body or officer empowered to execute the law. . . . In short, while the Legislature may delegate the power to find facts or determine the existence or nonexistence of a factual situation or condition on which the operation of a law is made to depend, or another agency of the government is to come into existence, it cannot vest in a subordinate agency the power to apply or withhold the application of the law in its absolute or unguided discretion, 11 Am.Jur., Constitutional Law, Sec. 234." (21 N.C. App. 477, 204 S.E.2d 870)
The Alabama Supreme Court in Knight v. West AlabamaEnvironmental Improvement Authority, 287 Ala. 15, 246 So.2d 903
(1971), stated:
 "This Court in the case of Porter Coal Co. v. Davis, 231 Ala. 359, 362, 165 So. 93, held that the legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend. To deny this would be to stop the wheels of government. There *Page 24 
are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must therefore be a subject of inquiry and determination outside of the legislative halls." (287 Ala. 23, 246 So.2d 909)
We conclude by paraphrasing a section from State v. Lisk, supra:
 "It should be apparent that the [Alabama Legislature] is not constantly in session, and, therefore, even if its members were all trained chemists and pharmacists, which they are not, it is impossible for them to keep abreast of the constantly changing drugs and medications and their inherent dangers which appear on the pharmaceutical scene. [Title 22, § 258 (26), supra] does not delegate the authority to define crimes; rather it is a delegation of authority to `find facts or determine the existence or nonexistence of a factual situation or condition on which the operation of a law is made to depend. . . .'" (21 N.C. App. 477, 204 S.E.2d 870)
 B
The appellant next contends that Title 22, § 258 (26), supra, violates her state and federal right to due process of law. She specifically contends that the State Board of Health classifies drugs and narcotics as controlled substances without notice to the citizens of this state to provide input into the decisions.[2] She also contends that the provision of automatic adoption of the federally controlled substances classifications by this state[3] is violative of her due process rights.
The state has deemed it vital to the welfare of its people that the a "drug industry" be regulated so as to disrupt harmful practices. The State Legislature, in the exercise of its police power, has the right to reasonably regulate the administration of drugs for the protection of the lives, health, safety, and welfare of the people. "[T]he police power of the state is that power which is necessary for its preservation, and without which it cannot serve the purpose for which it was formed. . . . As to what means are appropriate or needful for this purpose, the Legislature primarily must determine, and its acts in this regard should not be overturned by the courts, unless in clear contravention of the Constitution. . . ." State v. Campbell, 21 Ala. App. 303, 304,107 So. 788, 789 (1926). See also: McClary v. State,51 Ala. App. 30, 282 So.2d 379, rev. on other grounds, 291 Ala. 481, 282 So.2d 384 (1973); 28 C.J.S. Supp. Drugs and Narcotics § 7.
In Parke v. Bradley, 204 Ala. 455, 456, 86 So. 28, 29 (1920), we find the following:
 "The prevention of disease and the conservation of health, by all of the means known to modern science, is universally recognized as one of the most important and imperious duties of government, and in the construction of statutes enacted for such a purpose, under the police powers of the state, courts are agreed that great latitude should be allowed to the Legislature in determining the character of such laws, and how, when, and by whom, in their practical administration, they should be applied." (Citations omitted)
The Legislature has conferred upon the State Board of Health the authority to administer the control of drugs. There are specific guidelines set out in Title 22, § 258 (26) to follow. The Board of Health consists of the Medical Association of Alabama. The State Committee of Public Health acts for the Board of Health when it is not in session. This is a specialized agency in the complicated field of drugs and narcotics, an area beyond the scope of the average person. The Committee of Public Health generally administers the law and holds public meetings monthly. The Board of Health annually revises and republishes the drug schedules in newspapers of general circulation in the state. See: Title 22, § 1, Code of Alabama 1940, Recomp. 1958; Title *Page 25 
22, §§ 2 (4), 2 (5), 3, and 258 (38) Code of Alabama 1940, Recomp. 1958, 1973 Cum. Supp.
We do not believe that Title 22, § 258 (26) violates the due process clause in the constitution.
 "`While the due process clauses of the state and federal Constitutions are designed to preserve life, liberty, and property against the encroachments of mere arbitrary power, they do not intend to interfere with the power of the state by legislative enactment, without more, to impose, subject to judicial approval, such reasonable regulations as may be deemed essential to the general good of the community.'" State v. Campbell, supra, 21 Ala. App. p. 304, 107 So. p. 789.
We find no due process violation with the provision in Title 22, 258 (26)(d), concerning the adoption of federally controlled substances classifications. There is a waiting period of 30 days from publication of the final order in the Federal Register within which the Board of Health may object to the classification. In that case a hearing is provided for in which interested parties may be heard. In harmony with this we quote from 28 C.J.S. Supp. Drugs and Narcotics § 100.
 "In a number of states, statutes have been enacted regulating and controlling narcotics and dangerous drugs. A majority of the jurisdictions have adopted the Uniform Controlled Substances Act which was approved in 1970 by the National Conference of Commissioners on uniform state laws. This Act was designed to supplant the Uniform Narcotic Drug Act and the Model State Drug Abuse Control Act, relating to depressant, stimulant, and hallucinogenic drugs, and was drafted to achieve uniformity between the laws of the several states and those of the federal government; it has been designed to complement the new federal narcotic and dangerous drug legislation and provide an interlocking trellis of federal and state law to enable government at all levels to control more effectively the drug abuse problem."
(Emphasis supplied.)
From the record it appears that the State Board of Health complied properly under its statutory duty in classifying the drugs for which the appellant was convicted as controlled substances (see authorities cited).
This case is hereby due to be affirmed.
AFFIRMED.
All the Judges concur.
[1] Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723
(1964).
* Williford v. State, Ala.Cr.App., 365 So.2d 1257, cert. denied, Ala., 365 So.2d 1258 (1979).
[2] Particularly pentazocine and chlorazepate.
[3] Title 22, § 258 (26)(d).