439 So.2d 239 (1983)
Gary George SMIGIEL, Appellant,
v.
STATE of Florida, Appellee.
No. 82-404.
District Court of Appeal of Florida, Fifth District.
September 8, 1983.
Rehearing Denied October 5, 1983.
*240 Edwin H. Duff, III, Daytona Beach, and Donald A. Lykkebak, Orlando, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Mark C. Menser, Asst. Atty. Gen., Daytona Beach, for appellee.
DAUKSCH, Judge.
This is an appeal from a judgment of conviction and sentence of three years in prison for the crime of tampering with evidence, in violation of section 918.13, Florida Statutes.
The principal point on appeal is whether the trial court erred in denying the appellant's motion to suppress evidence obtained from an allegedly illegal search and seizure.
Appellant, an attorney, and Larry Deemer, his investigator, were charged by information on October 29, 1981, with tampering with evidence alleged to have occurred on or about December 5, 1980. Appellant sought suppression of a magnetic tape eraser seized October 12, 1981, from appellant's private law office pursuant to a search warrant, and to suppress all testimony concerning said evidence, any scientific reports or memoranda concerning said evidence and any evidence directly flowing from the search and seizure of said tangible evidence. The trial court denied appellant's motion to suppress, both at a pre-trial hearing and before introduction of the tape eraser at the non-jury trial.
Appellant's conviction was based upon the following facts. As defense attorney for Ralph Feathers in a drug case, the appellant sent a letter to an assistant state attorney requesting that arrangements be made for appellant and/or his investigator to listen to numerous incriminating tape recordings to be used against Feathers. Several conversations between Feathers and the state's informant had been recorded by electronic surveillance and the tapes were important in the case against Feathers, for independent corroboration of an informant's testimony.
Allen Kaye, a narcotics officer, testified that he went to appellant's law office on December 4 and 5, 1980, to allow appellant to hear and have a court reporter take down and transcribe the tapes. Kaye had no knowledge of the conversations on the tapes because he had not taken part in that investigation. When Kaye arrived at appellant's office at 9:00 a.m. on December 4th he, appellant, Deemer and Feathers listened to approximately four or five tapes. There were problems hearing them on Kaye's small cassette player so Deemer volunteered to go home and get his better tape player. When he returned they listened to approximately five more of the tapes until 4:00 p.m. when appellant indicated that he would like to finish listening to the rest of the tapes the following day. The court reporter was not asked to return the next day.
When Kaye returned to appellant's office at approximately 9:00 a.m. on December 5, 1980 he met with Deemer and they went to the office library where they had listened to the tapes the day before. They talked there for a few minutes and then Deemer invited him to have a cup of coffee in the room next door, which was approximately ten feet from the library. Kaye testified that he may have placed one or two of the *241 tapes on the table before he left the library to have coffee with Deemer. Kaye said he checked the back door to the library leading down the stairway, and it was locked, but he did not check the library bathroom. According to Kaye, he and Deemer were in the secretary's office talking and drinking coffee for approximately thirty minutes; he could continuously observe the door to the library, and did not see anyone go into the library.
Kaye recalled that after appellant and Feathers entered the room, they all went to the library and began listening to the remaining tapes. Three of them were totally inaudible and the remaining three had only a few words left on them. A court reporter was not present on December 5, 1980.
How the tapes became inaudible was the crux of the case  the state accused appellant of causing the problem. Officer Pat Green testified at trial that he had heard the tapes before they were taken to appellant's office and they were not inaudible; he said he listened to them afterwards and they had been damaged or erased. Kaye and Green checked the evidence locker and found nothing which might have caused the erasure of the tapes and another policeman, Mahoney, said accidental erasure could be ruled out because certain tabs had been punched out to prevent this. The "chain of custody" was established to support the state's position regarding the security of the tapes, except when at appellant's office.
After his conviction for the drug offense, Feathers contacted the state attorney's office concerning the events of December 4 and 5, 1980, and the destruction of several of the tapes. Feathers was promised nothing for the information except immunity for his conduct involved in destroying the tapes and he was told that he would not receive any reduction of his sentence.
Feathers testified that he listened to the tapes in his cocaine trafficking case in December of 1980 in appellant's library and that because there was trouble with the tape recorder on the first day the court reporter had difficulty hearing the tapes. Feathers said that at one time during that first day Deemer went home to get his tape recorder/player. According to Feathers, he, appellant and Deemer passed the tapes around quite a bit so that the officer would get used to their handling the tapes. He said something was to be done with the tapes but they were not sure what. He said that late in the afternoon on December 4th, when it became apparent that the tapes were damaging to Feathers' case, appellant called a recess until the next day.
After the officer left with the tapes the first day, appellant, Deemer and Feathers discussed how to destroy the tapes. Feathers testified that he and Deemer went to a hardware store, bought a magnet, came back to appellant's office and put the magnet inside the tape recorder, but discovered that it could not erase a tape. He said that appellant then went over to the desk of his secretary, who was not there, picked up an electronic magnet and said, "this is the only thing that will really work."
According to Feathers, when the three of them could not figure out how to keep the magnetic tape eraser under the conference table, appellant took the electronic eraser, put it behind the curtain in his library, plugged it in and said "we'll leave it here and tomorrow morning we'll erase the tapes."
Feathers said that the agreed upon plan was for Feathers to hide in the bathroom while Deemer persuaded the officer to go out for coffee with him. Meanwhile, appellant would appear to be trying to locate Feathers. Feathers was to wait in the bathroom and as soon as Deemer and the officer left, Feathers was to leave the bathroom, use the magnetic tape eraser from behind the curtain, walk out the exit door and come back in the front door and join the others who were having coffee.
Feathers admitted that the tapes were erased by him on December 5th as planned, and identified the tapes presented as evidence at trial as appearing to be the same tapes he erased that day. Feathers said that after the event, appellant quoted him a price of $100,000.00 for his services, saying it was worth that amount because if anybody *242 ever found out about the incident, it would be the end of his law practice.
Feathers admitted on cross-examination that the only reason he was testifying against appellant was because he had some faint glimmering of hope that something good would come out of it for him. He said that his sole motive for erasing the tapes was because appellant told him the state had no other evidence against him to sustain a conviction.
A joint stipulation containing the opinions of Dr. Harry Hollien, an expert in the field of communication science, was introduced into evidence. Dr. Hollien examined the tapes and the LaFayette magnetic tape eraser seized from appellant's office and compared the specific switching signature of the LaFayette magnetic tape eraser with the signature found on the erased tapes and found them to be identical. Dr. Hollien was of the opinion that the tapes in question were not erased by the use of a common magnet but, rather, with an electronic tape eraser.
The claimed illegal search warrant to obtain the magnetic tape eraser was obtained by Officer Kaye. Officer Kaye attached a two-page sworn statement relating his recollection of the events on those dates, including the fact that Deemer lured him out of the library and that, upon listening to the remaining tapes, they were blank. This affidavit was made on October 8, 1981, after Officer Kaye became aware of a sworn deposition given by Feathers on October 8, 1981, which was largely corroborative of Kaye's independent observations. In the deposition, Feathers detailed the plan to destroy the tapes which were the most damaging to his case. Feathers related appellant's involvement and admitted erasing the tapes as planned. Feathers also said that to his knowledge the appellant still had the electric eraser used to erase the tapes in his office. The affidavit for the search warrant consisted of Kaye's statements of his personal knowledge and recounted a summary of Feathers' deposition.[1]
*243 The appellant contends that the lower court erred in denying his motion to suppress because the affidavit in support of the search warrant did not meet the "Aguilar  Spinelli test"[2] for reliability and because the information in the affidavit was too stale to state probable cause sufficient to justify the issuance of a search warrant. It was ten months from the time the informant Feathers used, and presumably last saw, the tape eraser until he told the police about it. Appellant says this passage of time renders the affidavit for the search warrant insufficient to show probable cause that the tape eraser would still be at the office to be searched. Appellant also says Feathers was such a disreputable person that his testimony (affidavit or deposition) was unworthy of belief.
The Aguilar-Spinelli test has been disapproved by the court which developed it and that court has replaced it with a new test called the "totality of the circumstances" test in which the reliability, credibility and basis of knowledge of an informer are merely parts of all factors to be weighed when probable cause for a search warrant is under consideration. Illinois v. Gates, ___ U.S. ____, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
A decision of the United States Supreme Court is binding upon the courts of our state and the law as it stands when the point is considered by this court is the law to be applied to the case. Williams v. State, 366 So.2d 817 (Fla. 3d DCA 1979), cert. denied 375 So.2d 912 (Fla. 1979); Board of County Commissioners v. Dexterhouse, 348 So.2d 916 (Fla. 2d DCA 1977), affirmed Martin v. Board of County Commissioners, 364 So.2d 449 (Fla. 1978), appeal dismissed, 441 U.S. 918, 99 S.Ct. 2024, 60 L.Ed.2d 392. So, it is the Gates decision which controls this case and it is for us to decide whether the totality of the circumstances, demonstrated in the record to have been known by the warrant-issuing magistrate, constituted sufficient probable cause to support the search warrant. If so, then the search was lawful and the evidence (tape eraser) was properly admitted at trial. If not, then the evidence was inadmissible and a new trial, without the improper evidence, must be mandated.
While the ten months from the use of the tape eraser and the issuance of the search warrant is an exceedingly long period of time, we cannot say this factor alone should cause us to declare the evidence unlawfully seized. The factual basis upon which the warrant was issued is substantial enough to comply with the requirements of *244 Gates; or put differently, there was sufficient probable cause presented to the magistrate to satisfy the new, more "flexible, easily applied standard" announced in Gates. The Supreme Court has instructed all courts that:
The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the `veracity' and `basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a `substantial basis for ... conclud[ing]' that probable cause existed. Jones v. United States, ... 362 U.S. 257, at 271 [80 S.Ct. 725, at 736, 4 L.Ed.2d 697].
Gates, ___ U.S. ___, 103 S.Ct. at 2332.
A review of the affidavit leads us to the conclusion that all of the facts taken together would lead to a reasonable belief that the tape eraser was a standard item used by appellant's secretary in his law office. It is also reasonable to believe that Feathers' deposition was substantially truthful since it was corroborated by a police officer who the magistrate could believe to be telling the truth. Because the magistrate could reasonably believe the sworn testimony of the police officer, and the sworn testimony of the co-conspirator, and because the magnetic tape eraser is an item ordinarily used in a modern law office, the magistrate could properly conclude that a crime had been committed by appellant in his law office and that an instrumentality or evidence of that crime could be found there. The fact that ten months had elapsed makes the probability that the magnetic tape eraser was still there certainly weaker than if the crime had occurred only hours or days before, but we cannot say it was improbable (or there was a lack of probable cause) that this office equipment was still there. It could also be argued that a lawyer who commits a crime might be smart enough to dispose of the evidence which could convict him and thus there was no reasonable belief the tape eraser was still in the office. But we prefer to rest on the proposition that a lawyer who commits a crime is not smart, and thus the magistrate could decide that the tape eraser had not been done away with and was still in the office.
Given all the facts and circumstances, we affirm the order denying the suppression. We likewise reject appellant's contentions that section 918.13, Florida Statutes is unconstitutionally vague and overly broad. The statute is clear and concise enough for common understanding.[3] Finally, the evidence at appellant's non-jury trial was legally sufficient to support the conviction.
AFFIRMED.
SHARP and COWART, JJ., concur.
NOTES
[1] This is the affidavit in full:

On December 4, 1980, Volusia County Narcotics Task Force Agent Alan Kaye was requested to deliver to 533 Seabreeze Boulevard, Daytona Beach, Volusia County, Florida, certain evidentuary [sic] items, cassette recording tapes, reference case number 80-1786-CC, for the Defendant's discovery of conversations included on these exhibits. A number of these tapes were reviewed in the presence of Task Force Agent Kaye, by the Defendant's attorney, Gary Smigiel, with the Defendant Ralph Feathers, Larry Deemer, and an unidentified white/female believed to be Mr. Smigiel's girlfriend present. The first three to four tapes were transcribed by a Court Reporter hired by Attorney Smigiel. At the start of the session, the tapes were being played on Agent Kaye's portable cassette recorder, and then on a portable recorder belonging to Attorney Smigiel. Due to the fact that the Court Reporter was having a difficult time hearing what was being said, and the process was beginning to be rather time consuming, Mr. Deemer offered to go home and get his Lanier recorder. At that point, the Court Reporter was excused and Mr. Deemer went home to get his Lanier. Upon Mr. Deemer's return, the session continued. At approximately 5:00 PM, after listening to approximately ten tapes which just happened to be the point where the evidence became rather incriminating for Attorney Gary Smigiel's client, Mr. Smigiel requested we quit for the day, and continue the following day of December 5, 1980. The tapes were resealed in their container by Agent Kaye, and transported to the Volusia County Narcotics Task Force evidence vault.
On December 5, 1980, Agent Kaye returned to the office of Gary Smigiel, Attorney at Law, located at 533 Seabreeze Boulevard, Daytona Beach, Florida, for the purpose of continued discovery on the tape recordings that were in evidence in reference to the case against Mr. Ralph Feathers. As Agent Kaye entered the office area, he was greeted by Mr. Larry Deemer who suggested that Agent Kaye put the package of tapes in the Law Library, where the tapes were reviewed the previous day, and join Mr. Deemer for a cup of coffee. The Library appeared to Agent Kaye to be a safe place to leave the tapes and that the tapes would be secure in that area. Alan Kaye did then join Mr. Deemer in having coffee in a room located next to the Law Library, where Agent Kaye would see if anyone entered the Library. The delay was caused due to the fact that the Defendant in this particular case, Ralph Feathers, and Attorney Smigiel had not yet arrived at the office. Approximately twenty minutes later, Agent Kaye was greeted by Mr. Feathers who appeared to have just arrived at the office along with Mr. Smigiel. At that time all parties entered the Law Library to review the tapes. The package was opened by Agent Kaye, the tapes were handed to Mr. Smigiel for replaying. At this time the audio portion of the tapes was destroyed, there were no conversations discernible on the remaining six tapes.
On October 9, 1981, Narcotics Task Force Agent Alan Kaye became aware of a sworn deposition of Ralph Feathers made on October 8, 1981, who explained in detail the occurrences of December 5, 1980, whereupon the exhibits in question were tampered with. Mr. Feathers stated under oath that on December 4, 1980, after the first discovery session was completed, Attorney Smigiel, Larry Deemer, and Mr. Feathers talked and decided that the remaining six tapes were the most damaging to Feathers, and that they should be destroyed. At that point, Mr. Deemer and Mr. Feathers went to Dunn Brothers Hardware store to purchase an electro magnet. Mr. Feathers described the magnet to be small and barrel-shaped. When Mr. Feathers and Mr. Deemer returned, the magnet was placed in Mr. Deemer's Lanier recorder and they attempted to erase a cassette tape. Realizing this would not work, Mr. Feathers stated that Mr. Smigiel come up with an alternate plan, which is as follows. Attorney Smigiel hid a magnetic tape eraser behind a curtain in the Law Library. When Agent Kaye arrived, Mr. Deemer was to get him away from the tapes, which he did. At that point, Mr. Feathers who was hiding in the bathroom in the library, would come out and erase the last six tapes, which he did. According to Mr. Feathers, Mr. Feathers also stated that Attorney Smigiel attempted to charge him a fee of one hundred thousand dollars for this service. Mr. Feathers also stated that to his knowledge Attorney Smigiel still has the small barrel-shaped magnet, and the electric eraser used to erase the tapes in his office at 533 Seabreeze Boulevard.
[2] Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).
[3] 918.13 Tampering with or fabricating physical evidence. 

(1) No person, knowing that a criminal trial or proceeding or an investigation by a duly constituted prosecuting authority, law enforcement agency, grand jury or legislative committee of this state is pending or is about to be instituted, shall:
(a) Alter, destroy, conceal, or remove any record, document, or thing with the purpose to impair its verity or availability in such proceedings or investigation; or
(b) Make, present, or use any record, document, or thing, knowing it to be false.
(2) Any person who violates any provision of this section shall be guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.