Troy A. WILSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8377.

Court of Appeals of Alaska.

Dec. 26, 2003.

William B. Carey, Anchorage, for the Appellant.

Terisia K. Chleborad, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

On February 5, 2001, the Petersburg district court issued a warrant authorizing the search of Troy A. Wilson's residence for evidence of fourth-degree controlled substance misconduct under AS 11.71.040(a)(2)—possession of one ounce or more of marijuana for purposes of distribution. The question presented in this appeal is whether the information presented in the search warrant application established probable cause for the issuance of this warrant.

▆▆▆ When a search warrant application rests on hearsay information, the State must establish (1) that each of its hearsay informants is generally a credible source of information, and (2) that each informant obtained their present information in a reliable way.[1] As we explain in more detail below, the search warrant application in Wilson's case

---

1. *See State v. Jones*, 706 P.2d 317, 324–25 (Alaska 1985) (holding that, as a matter of state law, the *Aguilar–Spinelli* test governs the evaluation of hearsay information offered to support a search or seizure). The *Aguilar–Spinelli* test is derived from two decisions of the United States Supreme Court: *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). This test requires that, for each hearsay informant, the government must establish (1) the basis of the hearsay informant's knowledge and (2) the hearsay informant's credibility. *See State v. Jones*, 706 P.2d at 320.

rested on information supplied by three informants. Of these three, the State established the credibility of only one. This one reliable informant had hardly any personal knowledge of the alleged incriminating facts. Instead, the main incriminating information was supplied by the two informants of unproven credibility. Moreover, with regard to these two informants' allegations, the State failed to establish that the informants had personal knowledge of many of their incriminatory assertions. We therefore conclude that the information presented to the district court failed to establish probable cause for the issuance of the warrant.

### Details of the search warrant application

Petersburg Police Officer Gregg Siera applied for the search warrant and supplied all of the testimony in support of the search warrant application. He purported to rely on information he received from two police informants, "N-788" and "GS01-01". But, as will become clear in the next few paragraphs, Officer Siera actually relied on three informants: N-788, GS01-01, and an unnamed "friend" of N-788. Siera apparently was aware of the identities of N-788 and GS01-01, but he had absolutely no information about this unnamed friend.

Siera told the Petersburg magistrate that, on January 27, 2001 (*i.e.*, nine days before the search warrant application), he received a report from N-788. Siera testified that N-788 was a police informant who has proven to be reliable in the past.

N-788 told the police that a friend of his had purchased a quarter pound of marijuana from Troy Wilson for $900. But N-788 did not disclose any information about this friend—neither his name nor anything else about him.

Moreover, N-788 did not witness this sale (although his friend apparently showed him a supply of marijuana). Thus, N-788 was mainly reporting what his unnamed friend told him.

In addition, Siera did not know when this alleged sale of marijuana took place. Under questioning from the magistrate, Siera asserted that "N-788 contacted me shortly after the fact". But the "fact" that Siera is referring to must have been the unnamed friend's *statement* to N-788 that he had purchased marijuana—because N-788 said that he did not witness the sale. Even if we assume that N-788 made some statement to Siera concerning when the alleged sale took place, it is clear that N-788's information was obtained from his unnamed friend. In other words, any assertion about the timing of the purchase rests entirely on the unnamed friend's credibility.

N-788 told Siera that he himself had purchased marijuana from Wilson in the past. But Siera explained that N-788's purchase of marijuana occurred more than a year before.

Siera added one more incriminating assertion: he told the magistrate that, according to N-788, Wilson currently possessed approximately fourteen pounds of marijuana at his residence. But, again under questioning from the magistrate, Siera conceded that he had no idea how N-788 knew this. Siera told the magistrate, "I don't know if the [unnamed] friend told N-788 that, or if N-788 ... talked with Wilson. I don't know how N-788 came by that information."

Siera attempted to bolster N-788's report with information obtained from another police informant, GS01-01.

Siera testified that, on February 5, 2001 (*i.e.*, the day of the search warrant application, and nine days after Siera received N-788's report), GS01-01 reported that "he had heard" that a man named T.R. Kito had marijuana for sale, and that Kito had obtained this marijuana from Wilson.

But when the magistrate asked Siera how long ago it was that GS01-01 spoke to Kito, Siera responded that he did not know whether GS01-01 had *ever* spoken to Kito. Rather, GS01-01 had merely *heard* within the previous several days that Kito had marijuana for sale, and that Kito's supplier was Wilson. Siera conceded that he had no idea how GS01-01 heard that Kito had marijuana for sale, or how GS01-01 heard that Wilson was the one who sold the marijuana to Kito.

According to Siera's testimony, GS01-01 reported that, approximately one month before (presumably in late December 2000 or

early January 2001), GS01–01 had spoken personally to Wilson, and Wilson had told GS01–01 that "he was about to receive some marijuana and [that he] would be in the business of distributing it". But Siera admitted to the magistrate that GS01–01 was an untested informant. That is, Siera did not know whether GS01–01 was a credible source of information.

*Why we conclude that this information fails to satisfy the Aguilar–Spinelli test*

■ As we explained in the introduction to this opinion, when the State applies for a search warrant and bases its application on hearsay, the State must establish (1) that each of its hearsay informants is generally a credible source of information, and (2) that each informant obtained their present information in a reliable way. In this case, the State's search warrant application rested on information provided by three informants: GS01–01, N–788, and N–788's unidentified friend.

Of these three, N–788 was known to the police to be a reliable informant—*i.e.*, a generally credible source of information. GS01–01 was also apparently known to the police, but his credibility was untested. And with regard to N–788's unidentified friend, the police had absolutely no information about him (or her)—other than N–788's assertion that N–788 had seen his friend in possession of a substantial amount of marijuana. This tended to show that the "friend" was a member of the criminal milieu, thus obliging the State to affirmatively establish the unidentified friend's credibility.[2]

The State's problem in this case is that their one credible informant, N–788, had hardly any first-hand knowledge of Wilson's alleged criminal activities. N–788 had personally purchased an unspecified amount of marijuana from Wilson, but this was at least one year before.

The State's main allegation against Wilson was that Wilson had recently sold four ounces of marijuana to N–788's unidentified friend for the sum of $900. N–788 claimed to have recently seen his friend in possession of marijuana, but N–788 had no first-hand knowledge of how or when his friend obtained the marijuana. That is, N–788 did not personally know the identity of the person who supplied the marijuana, nor did N–788 know the purchase price or the date of the purchase. Indeed, N–788 apparently had no personal knowledge of whether his friend obtained the marijuana from one supplier or two or three. In short, all of the pertinent information about the alleged sale came from N–788's unidentified friend.

The State argues that the unidentified friend should be deemed a credible informant because the friend's statement to N–788 was against his (or her) penal interest. The State argues that, given the amount of marijuana involved, it is reasonable to assume that N–788's unidentified friend was a marijuana dealer. Thus, the State continues, when N–788's friend told N–788 about having recently purchased four ounces of marijuana, the friend would have perceived this statement as directly contrary to the friend's own interests.

In *State v. Bianchi*, 761 P.2d 127, 130–31 (Alaska App.1988), we accepted the State's argument that an informant's credibility could be bolstered by proof that their statements were against their penal interest. But the facts of *Bianchi* were quite a bit different from the present case. The identity of the drug purchaser / informant in *Bianchi* was known to the police and revealed to the magistrate. In addition, the informant provided a detailed account of her dealings with the suspected drug seller. But most important, her confessions of drug purchases and drug possession were made *to the police.* When we concluded that these statements were presumptively credible, we relied on the assumption that a person facing criminal charges for drug possession would not knowingly mislead *the authorities* about the source of the drugs—since the authorities could retaliate if they later discovered that the person's account was knowingly false. *Bianchi*, 761 P.2d at 131.

2. *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (3rd ed.1996), § 3.3(a), Vol. 2, pp. 88–89. *See also State v. Jones,* 706 P.2d at 324.

In other words, the rationale of *Bianchi* was not simply that the informant's statements were against her penal interest, but also that the informant knew that she might face repercussions if her statements to the police should prove to be knowingly false.

Here, the statements in question were made privately to a friend. Indeed, the record shows that N–788 was a good friend to this unidentified person—because even though N–788 was a police informant whose task was to alert the police to drug crimes, and even though N–788's unidentified friend purportedly possessed a substantial amount of marijuana (a sufficient amount for the friend to undertake sales of his or her own), N–788 would not disclose his friend's identity to the police.

This fact substantially undercuts the State's assertion that the unidentified friend must have known that the statements about the marijuana purchase could subject him (or her) to criminal penalties. And the second *Bianchi* factor—the speaker's knowledge that making false statements about the source of the marijuana could lead to adverse legal consequences—is completely lacking.

Indeed, there is nothing in the record to rebut the possibility that the unidentified friend was in the business of selling marijuana, that the friend obtained the marijuana from someone *other than* Wilson, but that the friend nevertheless intended for N–788 to go to the police with the accusation against Wilson—so that a potential competitor might be locked away in jail. Under this scenario, the unnamed friend's involvement tends to undercut N–788's *own* credibility—because N–788 obviously tailored his report to the police so as to protect the anonymity of his friend.

The State argues, in the alternative, that N–788's unidentified friend's statements about purchasing marijuana from Wilson were independently corroborated by information that the police received from the untested informant, GS01–01.

As explained above, GS01–01 told the police that, approximately one month before Siera applied for the search warrant (*i.e.*, in late December 2000 or early January 2001),

Wilson told GS01–01 that "he was about to receive some marijuana and [that he] would be in the business of distributing it". This information meets the first or "reliability" prong of the *Aguilar–Spinelli* test (*i.e.*, it was obtained first-hand), but the State offered no evidence on the second prong of the *Aguilar–Spinelli* test (*i.e.*, that GS01–01 was a credible source of information).

The State asserts that GS01–01's credibility is established by the corroborating fact that, in early February (that is, at about the time that Wilson said he would be receiving the marijuana), GS01–01 heard that Wilson had sold marijuana to T.R. Kito. The problem with this argument is that GS01–01 only *heard* this alleged "fact". It is utter hearsay. Moreover, Siera conceded that he had no idea who the source of this hearsay was.

The State alternatively asserts that GS01–01's credibility was established by the corroborating fact that, in early February (that is, at about the time that Wilson said he would be receiving the marijuana), Wilson sold marijuana to N–788's unidentified friend. But again, the "fact" that Wilson sold marijuana to N–788's unidentified friend is only a hearsay allegation—and the source of the hearsay is a person whose identity is completely unknown and whose credibility is unproven.

N–788 (whose credibility was established) did not personally witness the sale. N–788 heard his friend say that he or she had purchased marijuana from Wilson, and N–788 personally observed that his friend was in possession of marijuana. Siera testified that N–788 promptly reported these personal observations to the police. But this only proves the approximate timing of when N–788 *was told about* the purported sale. It does not prove either the occurrence of the sale, or (if the sale did indeed occur) the identity of the seller, or (if the seller was indeed Wilson) the timing of the sale. For all of these details, the magistrate was forced to rely on the unidentified friend's uncorroborated statement.

Finally, the State argues that even if its main allegations against Wilson rested on the untested assertions of the two informants (GS01–01 and N–788's unidentified friend)

whose credibility was unproven, these incriminating assertions should nevertheless be deemed "corroborated" because the accounts of the two informants dovetail so well. We disagree.

It is true that "[c]ross-corroboration among informants is a well-accepted method of demonstrating the validity of the information given."[3] Thus, probable cause might be established in a case where two informants whose credibility was unproven nevertheless provided detailed first-hand accounts that were in substantial agreement. But probable cause can not be established by "repetition of ... conclusory accusation[s]".[4]

Here, the State rests its case on two unelaborated accusatory statements, each made by a different informant whose credibility is unproven and whose motives are unknown. We conclude that this is insufficient to warrant a court-sanctioned invasion of a citizen's home under the search and seizure clause of our state constitution (Article I, Section 14). The district court should not have issued this search warrant, and the evidence seized under the warrant must be suppressed.

### Afterword

Although we invalidate the search warrant issued for Wilson's residence, we nonetheless wish to commend the Petersburg magistrate for her careful consideration of the search warrant application. Siera originally applied for the search warrant based solely on an affidavit. Magistrate Darlene Whitethorn immediately recognized the deficiencies in the affidavit and required Siera to supplement his application with testimony. During this testimony, Magistrate Whitethorn asked probing questions and repeatedly required Siera both to clarify his factual allegations and to specify the source of those allegations. Obviously, we disagree with the magistrate's ultimate conclusion regarding the existence of probable cause for the warrant. But disagreement between appellate judges and trial judges is inevitable. What is important is that Magistrate Whitethorn conscientiously scrutinized the search warrant application

using the *Aguilar–Spinelli* analysis—thus fulfilling her two-fold duty to aid society's legitimate law enforcement efforts while at the same time protecting citizens from unwarranted government intrusion into their homes and privacy.

### Conclusion

The judgement of the superior court is REVERSED.

---

3. *Ivanoff v. State,* 9 P.3d 294, 300 (Alaska App. 2000).

4. *Ivanoff,* 9 P.3d at 300.